2020 IL App (2d) 200007-U
No. 2-20-0007
Order filed June 1, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF JEFFREY NOYES, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No.  13-D-1156 |
| | ) | |
| EMILY NOYES (n/k/a EMILY PADDOCK), | ) | Honorable |
| | ) | Janelle K. Christensen, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*: (1) Trial court's finding that father failed to prove by a preponderance of the evidence a substantial change in circumstances warranting a modification of parenting time was not against the manifest weight of the evidence; (2) trial court did not err in implementing certain "minor" changes to the parties' custody judgment; (3) trial court erred in ordering parents to attend individual counseling; and (4) trial court properly found father in indirect civil contempt for violating provisions of custody judgment.

¶ 2   In November 2013, the circuit court of Lake County dissolved the marriage of petitioner, Jeffrey Noyes, and, respondent Emily Noyes, n/k/a Emily Paddock. Pursuant to the custody judgment incorporated into the parties' judgment for dissolution of marriage, the parties agreed to share joint legal custody of their two minor children, A.M.N and A.N.N. The custody judgment

designated Emily as the primary residential parent subject to Jeffrey's parenting time. In June 2016, the parties entered into an agreed order modifying the custody judgment.

¶ 3    On April 25, 2018, Jeffrey filed several pleadings, including a "Petition to Increase Parenting Time, for Modification to Parenting Time Provisions of Custody Judgment and Subsequent Parenting Time Order and for Other Relief." In his petition, Jeffrey sought an increase in his parenting time with the parties' minor children, alleging that, pursuant to section 610.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/610.5(c) (West 2018)), "[n]umerous changes in circumstances" had occurred which would warrant such an increase. Jeffrey also sought modification of certain other provisions of the custody judgment, including provisions related to vacation and holidays. On June 7, 2018, Emily filed a "Petition for Rule to Show Cause for Indirect Civil Contempt of Court and Other Relief," alleging, *inter alia*, that Jeffrey violated the parties' custody judgment on multiple occasions in 2018.

¶ 4    On December 9, 2019, following a multi-day hearing, the trial court issued its ruling on the parties' petitions. The court found that Jeffrey failed to prove by a preponderance of the evidence that there had been a substantial change in circumstances which would warrant a modification of the parties' custody judgment under section 610.5(c) of the Act (750 ILCS 5/610.5(c) (West 2018)). However, pursuant to section 610.5(e) of the Act (750 ILCS 5/610.5(e) (West 2018)), which permits a court to modify a parenting plan or custody judgment absent a showing of changed circumstances in limited situations, the trial court made several modifications to the custody judgment, including some modifications requested by Jeffrey in his petition. In addition, the trial court found Jeffrey in contempt based upon the violations of the custody judgment alleged by Emily.

¶ 5 Jeffrey now appeals, arguing that the trial court erred by (1) not finding a substantial change in circumstances had occurred since June 2016; (2) ordering numerous "minor" modifications to the parties' custody judgment; and (3) finding him in indirect civil contempt for his failure to comply with the custody judgment. We affirm in part and reverse in part.

¶ 6 I. BACKGROUND

¶ 7 Jeffrey and Emily were married on July 8, 2006. Two children were born to the parties during the marriage, A.M.N., born on October 9, 2008, and A.N.N., born on August 4, 2010. Jeffrey filed a petition for dissolution of marriage on June 21, 2013. On November 15, 2013, the trial court entered a judgment for dissolution of marriage, which incorporated a custody judgment entered in October 2013. Pursuant to the custody judgment, the parties agreed to share joint legal custody of the minors. The custody judgment designated Emily as the primary residential parent subject to Jeffrey's parenting time. The parties acknowledged that Jeffrey "frequently travels for work" and therefore agreed to cooperate to provide him with parenting time at least once during the school week. On June 7, 2016, the parties entered into an agreed order modifying the custody judgment. Among other things, the June 2016 agreed order granted Jeffrey parenting time on alternating weekends (from Friday at 5 p.m. through Monday at 7 p.m.), on a "floating overnight" every two weeks, and on Wednesdays from 4:30 p.m. to 7:30 p.m.[1]

¶ 8 As detailed in a prior appeal (*In re Marriage of Noyes*, 2018 IL App (2d) 170667-U), the parties' relationship following the entry of the judgment of dissolution of marriage was less than amicable and the subject of various post-decree pleadings, including orders of protection, petitions

---

[1] The three-hour block of Jeffrey's parenting time on Wednesdays was subsequently modified by the parties to be from 4 p.m. to 7 p.m.

to restrict parenting time, and petitions to restore visitation. In addition, in January 2017, Emily filed a petition to relocate from Illinois to Ohio. As grounds for the petition, Emily stated that she wanted to move to Ohio to be with her current husband, Albert Halleck Paddock III (Hal) and his four children. Jeffrey objected to the relocation petition. Following a trial in July 2017, the trial court denied the relocation petition. This court subsequently affirmed the trial court's decision. *Noyes*, 2018 IL App (2d) 170677-U.

¶ 9     On April 25, 2018, Jeffrey filed various pleadings, including a "Petition to Increase Parenting Time, for Modifications to Parenting Time Provisions of Custody Judgment and Subsequent Parenting Time Order and for Other Relief." Jeffrey's petition consisted of four counts. In count I, Jeffrey requested modification of a provision in the custody judgment granting each parent two weeks of vacation time each year. Specifically, Jeffrey requested that " 'vacation time' specifically refer[] to the time that occurs during the children's summer vacation from school" and that the two weeks of vacation time provided for in the custody judgment "be taken in non-consecutive, seven-day increments." In count II, Jeffrey asked the court to revisit provisions of the custody judgment regarding the holiday schedule so as to make it "consistent" with the minors' school schedule since neither minor was of school age at the time the custody judgment was entered. In count III, Jeffrey requested an increase in his parenting time, alleging that, pursuant to section 610.5(c) of the Act (750 ILCS 5/610.5(c) (West 2018)), "[n]umerous changes in circumstances" had occurred which would warrant an increase in his parenting time. Specifically, Jeffrey noted that (1) Emily had remarried and had a baby, (2) Emily spends "significant time in Ohio [and] frequently takes [the minors], which has caused them to miss school and activities as a result," (3) Jeffrey was engaged to be married to Natalie Keister, a woman with two children (ages 9 and 7) from a previous relationship, (4) the minors "are older and *** accustomed to spending

- 4 -

more time with Jeffrey and enjoy their time with him," and (5) Jeffrey "has more control over his work schedule and is typically able to select the days he travels for work." Jeffrey requested the elimination of the "floating overnight" and sought additional parenting time "every Wednesday after school through Friday drop off at school and every other weekend through Monday drop off at school." Finally, in count IV, Jeffrey asked the court to modify or eliminate a provision in the custody judgment providing for a right of first refusal, which was triggered if either parent would be away from the children for a period of six hours or more during his or her parenting time.

¶ 10    On May 23, 2018, the trial court appointed Marc Fisher as the GAL for the minors. Fisher was instructed to submit a report to the court addressing the "pending motions/petitions."

¶ 11    On June 7, 2018, Emily filed a "Petition for Rule to Show Cause for Indirect Civil Contempt of Court and Other Relief." In the contempt petition, Emily alleged that Jeffrey (1) violated the parties' custody judgment on Presidents' Day weekend in 2018 by unilaterally removing the minors from school during Emily's parenting time and belatedly returning the minors to Emily; (2) violated the parties' custody judgment on Easter 2018 by returning the minors to Emily after the commencement of her parenting time; and (3) failed to attend therapy with the minors.

¶ 12    A trial on the pending petitions commenced on October 7, 2019, and continued on October 8 and 10, 2019. Three individuals testified at the trial: Fisher, Emily, and Jeffrey. A summary of the testimony follows.

¶ 13    Fisher testified that the court appointed him to investigate issues relating to parenting time. Fisher authored a report dated July 5, 2019, containing his recommendations, which was admitted into evidence by stipulation. Fisher noted that he was "asked not to address the legal scope of whether there had been a substantial change [in circumstances]" and that his recommendations

"were simply best interest, not scope related as it relates to a petition." Fisher conducted his investigation between May 2018 and July 2019, meeting multiple times with the minors, the parties, and several "collateral" contacts, including Dr. Jill Martin (the minors' school principal), the school social worker, Dr. Chinni Chilamkurti (the family counselor), Victoria Denhof (the minors' therapist), the maternal grandparents, and the paternal grandparents. Although not mentioned in his report, Fisher also spoke with investigators from the Department of Children and Family Services (DCFS) due to investigations of Jeffrey that occurred during the case.

¶ 14    Fisher testified that the minors are doing well socially and academically. They may have missed a few days of school, but "nothing that raised a level of concern." Fisher further testified that the minors have a happy and healthy relationship with both parents, they did not have anything "significantly negative" to say about their stepmother, and that they are bonded with and care greatly for their extended families. Fisher did not report any "ill effects" from the parenting schedule that had been in place since June 2016. However, he opined that the minors would "thrive better *** without having the transitions back and forth with the [Wednesday] dinners." During his meetings with the minors, Fisher asked them if they wanted a change to the parenting schedule. The minors expressed that "they were open to small changes, but they did not want any significant changes" and that they did not want to see Emily less. Fisher nevertheless felt that additional time with Jeffrey would benefit the minors.

¶ 15    Fisher opined that the minors "seem to be influenced by Emily's perceptions of Jeffrey." Fisher reported that both minors initially spoke negatively about Jeffrey and were "prepared to share information with [him]" at meetings which struck him as "misplaced [and] not age appropriate." These observations were echoed by Dr. Chilamkurti, Denhof, and Principal Martin. According to Fisher, Dr. Chilamkurti felt that the minors' "actions and statements [were]

influenced by Emily at times, including their impression of Jeffrey and his actions." Denhof voiced a similar opinion, adding that while the minors "have shifted some of their perceptions throughout the initial stages of therapy, the perception that Emily influences the [minors] remains at times." Principal Martin and the school social worker reported that the minors would regularly come to the school office with various complaints about Jeffrey, some of which resulted in mandated calls to DCFS. Principal Martin and the school social worker "expressed concern that the [minors] were heavily influenced by Emily and that the [minors'] complaints, especially about [Jeffrey], were perpetuated by Emily." Fisher testified that when formulating his opinions, he considered the fact that Dr. Chilamkurti, Denhof, and Principal Martin all believed that Emily had influence over the minors' thinking towards Jeffrey.

¶ 16    Fisher testified that statements made by the children to DCFS investigators, contained in case reports admitted into evidence, were consistent with what he learned as part of his investigation. In those reports, the DCFS investigator stated that A.M.N. "seemed to have some sort of check list" and that A.M.N. reported that she "tells Mom about Dad and she helps me. [Mom] tells me to tell people about Dad, like [my] teachers. I'm going to see a counselor named Marc. And when Dad asks me about my conversation, Mom told me to tell dad, quote, it's private. Mom helps me put words in my mouth to Dad." Fisher further testified to the statements of Principal Martin, detailed in the DCFS reports, that the minors seemed to be "used as pawns" and to be "brainwashed."

¶ 17    However, Fisher also believed that Emily had done positive things to facilitate a relationship between the minors and Jeffrey, such as being "more flexible with offering some additional time and additional contacts," allowing Jeffrey's parents to see the children on days Jeffrey was not able to exercise his parenting time, and inviting Jeffrey's parents over to see the

minors when it was not Jeffrey's parenting time, such as the first day of school. Fisher described Jeffrey's and Emily's relationship as "strained at times" and "somewhat difficult," but noted their communication has improved as this case has progressed. Fisher attributed the improvement in communications to the parties' participation in joint counseling sessions and the litigation. Although Fisher and Emily had various conversations about schedules that provide Jeffrey additional parenting time, Emily would prefer a 10-4 schedule, *i.e.*, the children spend 10 overnights with her and 4 overnights with Jeffrey during each 14-day period. Fisher had a differing opinion as to the increase in parenting time, but agreed with a statement Emily made to him that minor changes are needed to fix ongoing conflicts and loopholes between the parties.

¶ 18    Fisher opined that there is an element of Jeffrey's own personal desire in his request for more parenting time. Fisher noted that the parenting time provided for in the June 2016 agreed order is not all the time Jeffrey has with the minors. Jeffrey sees the minors at extracurricular activities, he has coached the minors' soccer team for years, and goes to the minors' games and practices. In addition, Jeffrey attends as many parent-teacher conferences, school recitals, and academic fairs as he can. When questioned about Jeffrey's work schedule, Fisher testified that he believes Jeffrey has "some flexibility," but he is "not confident it's as flexible as [Jeffrey] would want everybody to believe." Fisher testified that there were occasions when Jeffrey missed parenting time for work, but could not recall the specifics. At the time he wrote his report, Fisher believed that Jeffrey was missing approximately eight Wednesdays per year, but said if the evidence showed Jeffrey missed more than that, it could "potentially" change his opinion as to whether Jeffrey should have increased parenting time.

¶ 19    Fisher testified that the "current situation has drastically improved for the [minors] and the parents since the case returned to court a little over one year ago." Nevertheless, he opined that the

current parenting schedule was not serving the minor's needs or best interests. He observed, for instance, mid-week dinners were stressful for everybody and that Jeffrey's "floating overnight," which he frequently exercised on Thursday, is not working. He concluded that "additional time with Dad would benefit [the minors] based on [his] interactions and discussions with the therapists and everybody involved" and opined that fixed days would result in less conflict among the parties and provide more certainty and structure for the minors. Fisher recommended that Jeffrey's parenting time be increased from 4 out of every 14 overnights to 6 out of 14. Specifically, Fisher recommended that Jeffrey have parenting time (1) alternate weekends from Thursday until Monday morning and (2) Wednesday and Thursday overnight during the week before Emily's weekend. Although Fisher did not recommend 50-50 parenting time, he noted that both Dr. Chilamkurti and Denhof believed that the minors would "acclimate fine" if they spent 50% of the time at Jeffrey's house. Fisher concurred, stating that he believes the minors will function well whether a 14-day parenting time block is allocated 7-7, 8-6, or 9-5, and he sees "no significant difference" between any of those schedules.

¶ 20    Fisher also testified about other sections of the parenting schedule. He testified that both parties alleged the other had violated the custody judgment as it relates to vacation time. In particular, Fisher noted that language in the custody judgment providing each party with 14 days of vacation time that he or she can use at any time of the year had been used to create extended periods of parenting time beyond what is typical. Fisher believed that the vacation time should be taken in summer as either two 7-day blocks or one 14-day block. Alternatively, Fisher recommended a rotating week-on, week-off schedule during the summer. In addition, Fisher recommended that each parent enroll in individual counseling because "they both have individual things they can work on to better themselves with their children" and both Dr. Chilamkurti and

Denhof "recommended individual counseling and asked [him] to strongly recommend that to the Court." Finally, Fisher testified that he did not believe that it would be in the best interests of the minors to eliminate the right of first refusal. Fisher felt that an appropriate right-of-first-refusal provision "would essentially be an overnight period."

¶ 21    Emily testified that she has lived in Vernon Hills with the minors since 2013. Hal, Emily's husband, began living with her there "at least half time" in 2015 after they were married. Emily and Hal have a daughter, R.P., who was born in 2017. Emily generally has parenting time with the minors 10 out of every 14 days in a two-week period. The minors have been in the same school district since preschool. They attend Hawthorn Elementary South. A.M.N. has attended the school since first grade while A.N.N. has attended the school since kindergarten. The minors take the bus to school, and Emily picks them up. Emily testified that the minors are doing "great" academically and "better" than they were a year earlier. Emily also testified that the minors have improved socially in the past year and are doing "very good" as they "[a]lways ha[ve] been." Emily attributed the improvement to counseling and the minors' maturation. Emily noted that she does not typically travel to Ohio during the minors' school year and only went twice during the last academic year.

¶ 22    Emily works out of her home office for Cardinal Health, where she has worked for over 10 years. Emily's hours vary because she can work "whenever [she] see[s] fit," but she "rarely" travels for work so she "can be home for the girls." Based upon the expense records Jeffrey subpoenaed from Emily's employer, Emily determined that over a three-year span, she has missed her parenting time on 19 occasions. Emily testified that she has offered her parenting time to Jeffrey on occasions she has had to travel, but Jeffrey has not reciprocated by offering her a right of first refusal.

¶ 23    Emily believes the parenting-time schedule currently in place has allowed the minors to

bond with her, Jeffrey, both sets of step-siblings, and their half-sister. Emily's issue with the parenting schedule is that Jeffrey does not exercise all of his parenting time. Using Our Family Wizard (OFW) notifications from Jeffrey, texts from Jeffrey, Jeffrey's "subpoenaed expense reports," and her own expense reports, Emily calculated that Jeffrey has missed 42 Wednesday dinners and 30 floating overnights from June 7, 2016, to the date of trial. Emily thinks Jeffrey has "[a]bsolutely" minimized the amount of time that he travels, based on "the expense records and his OFWs, text messages." Emily is "concerned for the [minors] when their parent is not available [when] they are supposed to be" and "think[s] that is not consistent for the [minors]." Part of structure, in her eyes, means a parent being present for the majority of their parenting time. Emily testified that she has offered Jeffrey's time on Wednesday to his parents "a little over a handful of times" when he could not exercise it. She has agreed to extend his time "just so [Jeffrey] can be able to spend a little bit more time with [the minors] if he's out late," and has let him keep the minors overnight.

¶ 24    Emily also testified that there have been many issues that have caused arguments between her and Jeffrey related to parenting time and that language in the custody judgment needs to be corrected to fix ongoing conflicts and loopholes. One of the conflicts involved Jeffrey refusing to allow Emily to leave early on a trip to Missouri, where her family lives, for her grandmother's funeral. In addition, the parties have had conflicts over the use of vacation time and the Thanksgiving holiday. Emily also believes the minors should have fewer transitions.

¶ 25    Emily believes Jeffrey is verbally and emotionally abusive and has anger issues. She noted that Jeffrey "has been assessed for anger management before," per a court order. She has seen Jeffrey be physically abusive towards the minors, which the minors "have stated." Based on "the advisement of DCFS," Emily has filed orders of protection against Jeffrey on three occasions. The

orders of protection were dismissed because court orders were entered in Emily's and Jeffrey's divorce case addressing her concerns. Of the seven DCFS investigations into Jeffrey, all of which were unfounded, Emily never personally made a DCFS hotline call against Jeffrey. She did, however, call DCFS in the summer of 2018 to see if there was an ongoing investigation after the minors told her they were pulled out of class and interviewed by DCFS.

¶ 26    With respect to the opinions of Dr. Chilamkurti, Denhof, Fisher, Principal Martin, and the DCFS investigator that she was "coaching or influencing the girls with regard to their thoughts on Jeff," Emily responded that those opinions were attributable to the girls not talking like normal children and not being afraid to share. Emily stated that, as their mother, she "of course, influence[s] [the minors] in lots of ways," and aside from hearing "[Fisher] on the stand," she is "not aware that [anyone] stated [she] influenced them negatively." She disagreed with Principal Martin's belief that the minors were being brainwashed, attributing that belief to Principal Martin liking drama and the girls' strong opinions. She testified that she "never" negatively influenced the children towards Jeffrey. She testified that the minors receive intensive counseling, which started when A.M.N. was five and A.N.N. was three. During counseling, the minors have learned "to discuss what's happened to them." Their therapist has had them do exercises at home such as writing about Jeffrey on a whiteboard "to process what feelings they were going through." The therapist has also provided one of the girls with post-it notes and a journal to write in "to process her thoughts when she was not with her therapist." Emily believes the minors "have very strong opinions and they're very smart." Emily believes the minors should continue therapy. Emily added that while she is "not opposed" to individual counseling for herself and has a therapist she can contact if necessary, she does not feel that she is currently in need of regular, ongoing therapy.

¶ 27    Emily acknowledged that between 2014 and mid-2016, she had to force the minors to visit

Jeffrey, but no longer has to do so. Emily noted that since the entry of the June 2016 agreed order, Jeffrey remarried and moved into a new home with Natalie and her children, with whom the minors enjoy good relationships. Emily further testified that both minors now play travel soccer and that A.M.N.'s practices are in Lake Forest, which is "a little bit further away." According to Emily, the minors' bedtimes are now 60 to 90 minutes later, at 9 to 9:30 p.m., as opposed to 8 p.m. in 2017.

¶ 28    Emily testified that she is "not angry" and has "accepted" that she was unable to move to Ohio with Hal. Emily does not put the minors in the middle of things between her and Jeffrey because she does not want to "make them paranoid about that type of adult issue." She believes that Jeffrey is a good father, that the minors enjoy their time with them, and that the minors have a good relationship with him, which Emily thinks is "great for them to have." Emily testified that she is not opposed to Jeffrey having more parenting time and believes that having the minors spend more time with their father would be in their best interests. However, she does not agree on the amount of additional time. Emily testified that she thought the minors would acclimate fine if they had an additional overnight with Jeffrey every two weeks (a 9-5 schedule) and the minors would be okay with that. But Emily also testified that she does not agree that spending more time with their dad would improve their relationship with him. She explained that the minors' relationship with Jeffrey right now is "really good," so "changing something that works doesn't sound like a good idea. And that's what [the minors'] wishes are, so [she] prefer[s] to listen to the girls."

¶ 29    Jeffrey testified that he married Natalie on May 12, 2018. Shortly thereafter, he purchased a new home in Libertyville where he now resides with Natalie, her two children from a prior marriage, and the minors. The minors get along very well with Natalie and her two children. Jeffrey's new home is "about 20 blocks" from his prior residence, which was also in Libertyville, and "about an 11-minute drive" to the minors' school.

¶ 30    Jeffrey is employed by Fresenius Kidney Care. Jeffrey testified that the "lion's share" of his job duties involve interacting with physicians. After 13 years with the company, including 6 years in the same position and 8 years in the same region, he is able to do much of his work via "teleconference or phone calls," and his employer "has really pushed [him] to stop traveling as much." Jeffrey testified that there have not been changes to his work responsibilities since 2016, but that being more tenured has "absolutely" affected his schedule's flexibility. Jeffrey testified that his ability to pick the days he travels is "75 to 80 percent" in his control and that there are "three to five" travel dates he absolutely has to attend in a given year.

¶ 31    Jeffrey testified that the minors have adapted well to R.P., Emily's new baby, whom they enjoy. The minors also enjoy spending time with both sets of their step-siblings. Jeffrey thinks the minors are "very, very lucky" because "[t]hey have two sets of family that really, really do care and adore them." Jeffrey testified that the minors are doing "very well" in school. Both minors are "average to higher-than-average" students. Although there was an issue with the minors going to Principal Martin during the 2017-2018 school year, it resolved in 2019.

¶ 32    Jeffrey stated that his relationship with the minors "has always been good" and "continues to get better." Jeffrey and Emily both attend the minors' extracurricular activities, and he believes they both "do a very good job" of trying to attend as many events as possible. Moreover, other than the minors no longer participating in dance and A.M.N. qualifying for the basketball team, "nothing major" has changed related to the minors' activities. Jeffrey testified that while he coached both girls in soccer for the last six or seven years, he could no longer do so as the girls were now at a level where coaches are paid positions for which he was not qualified.

¶ 33    Under the current parenting schedule, in addition to alternating weekends, Jeffrey has Wednesday parenting time from 4 p.m. until 7 p.m. and a "floating overnight" every two weeks,

which he typically exercises on Thursdays. Jeffrey testified that he has missed "no more than 10" floating overnights in the last three years, in addition to between 27 and 36 Wednesdays. Jeffrey stated that one of the reasons he did not like the current parenting schedule was because he could go almost a week without seeing the minors. However, he acknowledged that this situation occurs "rarely" because he has some form of contact with the minors on at least 8 out of each 14-day block with the current schedule. When Jeffrey does go a week without seeing the minors, it is because he chooses to exercise a "floating overnight" on a Monday. Jeffrey testified that he wanted a 50-50 parenting-time schedule, including Wednesday and Thursday overnights, citing his growth as a parent and the improvement in his relationship with the minors, as well as his more flexible work and travel schedule. Jeffrey also testified as to the vacation schedule, noting that it has resulted in conflicts between the parties and him going several weeks without having parenting time with the minors. Jeffrey would prefer to alternate weeks during the summer, if possible, to coincide with the week-on, week-off schedule that Natalie's children have in the summer.

¶ 34    Jeffrey testified that the therapeutic process initiated by Fisher has been "very, very beneficial." He testified that the process halted Emily's "baseless allegations" against him, stopped the minors' pattern of going to their principal's office and reporting on him frequently for "[a]lmost a year" between 2017 and 2018, and provided the girls with an avenue to communicate and feel comfortable talking about things they otherwise would not have been comfortable talking about. The involvement of counselors and the GAL also reduced the number of instances in which Emily influenced and prompted the minors. Jeffrey testified that the contentious relationship between him and Emily has "ebb[ed] and flow[ed]" over the years, and in the last year, has been "similar to past years." He also indicated, however, that his and Emily's relationship "has become more difficult, even since the latest order was entered in 2016," citing conflicts regarding the parties'

use of allocated vacation days and Emily's purchase of cell phones and setting up social medial accounts for the minors without consulting him.

¶ 35    Jeffrey is "okay with" Fisher's recommendation that he and Emily attend individual counseling and has "sought it out." He has "calls in to two different practices right now," which he only made the week before trial, despite the fact that Fisher submitted his report on July 5, 2019. Further, Jeffrey testified that despite being ordered to attend therapy with the minors, he has not done so in years.

¶ 36    Jeffrey testified that in 2018, President's Day fell on the Monday after Emily's weekend but he took the minors out of state from Friday through Monday. Jeffrey testified that he did not use vacation time because he believed that due to past precedent, he was entitled to the whole weekend every year. Jeffrey also testified that on Easter weekend in 2018, he took six hours of Emily's parenting time by returning late from his spring vacation with the minors.

¶ 37    On December 9, 2019, the trial court issued a written judgment resolving the parties' petitions. At the outset, the court found that the parties had a "difficult" and "adversarial" relationship and that, at times, each party had placed his or her own interests over the best interests of the minors. Despite this finding, the court concluded that both minors were well adjusted and enjoyed strong relationships with both parties. The court then discussed Jeffrey's bases for seeking modification, noting that pursuant to section 610.5(c) of the Act (750 ILCS 5/610.5(c) (West 2018)), it must consider whether (1) Jeffrey established by a preponderance of the evidence that a substantial change has occurred in the circumstances of the minors or of either parent based on facts that have arisen since the entry of the existing parenting plan or facts that were not anticipated therein and (2) a modification is necessary to serve the minors' best interests. The court found that Jeffrey "has shown facts that have changed" since the entry of the June 2016 agreed order. The

court noted, for instance, that: (1) both parties have remarried; (2) the families have grown to include several step-siblings and one half-sibling; (3) the minors are older and involved in more activities; (4) the minors are doing better academically and socially; and (5) Emily travels to Ohio with the minors during her parenting time. The court also noted Jeffrey's allegation that Emily has had a negative influence on the minors and his testimony that he has greater flexibility over his work schedule. Nevertheless, the court found that Jeffrey failed to prove by a preponderance of the evidence that any of these changes constituted a "substantial" change for purposes of section 610.5(c) of the Act. The court reasoned that many of the changes identified by Jeffrey were to be expected as they are "consistent with the normal evolution of a family and the maturation of the children" and that there was no evidence that Emily's travels to Ohio had a negative impact on the minors. The court also found that any issues related to Emily's negative influence on the minors had been resolved through counseling and the minors are now happy spending time with Jeffrey and enjoying their time with him. Finally, the court rejected Jeffrey's claim that his work schedule was more flexible on the grounds that Jeffrey's testimony lacked credibility and he offered no documentary evidence in support of his claim.

¶ 38    After finding that Jeffrey failed to meet his burden of proof to show a substantial change in circumstances under section 610.5(c) of the Act, the court addressed whether to make any modifications under section 610.5(e) of the Act (750 ILCS 5/610.5(e) (West 2018)). That provision permits a court to modify a parenting plan or allocation judgment without a showing of changed circumstances if the modification is in the child's best interests and one of four conditions is proven. 750 ILCS 5/610.5(e) (West 2018). Among the conditions are that the modification (1) "reflects the actual arrangement under which the child is receiving care, without parental objection, for the 6 months preceding the filing of the petition for modification" (750 ILCS 5/610.5(e)(1)

(West 2018)) or (2) "constitutes a minor modification in the parenting plan or allocation judgment" (750 ILCS 5/610.5(e)(2) (West 2018)).

¶ 39    The court made two modifications pursuant to section 610.5(e)(1) of the Act (750 ILCS 5/610.5(e)(1) (West 2018)). First, the court converted Jeffrey's "floating" bi-weekly overnight into a fixed bi-weekly overnight on Thursday. The court found that such a change reflected the parties' course of conduct in that Jeffrey typically elected Thursday as his "floating" overnight. Second, the court struck a portion of the custody judgment providing each party with the right to four uninterrupted weekends each year. The court found that such a change reflected the parties' course of conduct as there was testimony at trial that neither party has exercised his or her right under the stricken provision. See 750 ILCS 5/610.5(e)(1) (West 2018).

¶ 40    In addition, the court made several modifications pursuant to section 610.5(e)(2) of the Act. Specifically, the court: (1) extended both parties' holiday parenting time by two hours (from 8 a.m. until 6 p.m. provided in the custody judgment to 8 a.m. until 8 p.m.); (2) granted Jeffrey parenting time on President's Day and the weekend immediately preceding the holiday; (3) reformulated the parties' vacation schedule by granting each party "two 7 day blocks or one 14 day block of vacation time during the summer break" (instead of 14 days over the course of a year in any increment); (4) clarified the spring break vacation schedule; and (5) clarified the Thanksgiving holiday vacation schedule.

¶ 41    The court also acknowledged that Jeffrey's three-hour block of parenting time every Wednesday was "not working." The court stated that converting every other Wednesday dinner to an overnight would result in an additional 24 overnights, thereby increasing Jeffrey's parenting time by 6.6%. Based on the October 2013 custody judgment and the June 2016 agreed order, the court calculated that Jeffrey has 131 overnights each year. The court noted that granting Jeffrey an

additional 24 overnights would result in him having 155 overnights per year. The court found that such a modification "would have a major impact because [Jeffrey] would cross the 146-day threshold for child support." See 750 ILCS 5/505(a)(3.8) (West 2018) (altering calculation for child support "[i]f each parent exercises 146 or more overnights per year with the child"). The court stated that in order to modify child support, a substantial change is required. The court noted, however, that if it were to convert one Wednesday per month to an overnight, "that act would increase [Jeffrey's] parenting time by 12 overnights per year, constituting a 3.3% increase and [resulting in] approximately 143 overnights per year." The court found that a 3.3% increase in Jeffrey's parenting time "is in the minors' best interest and *** constitutes a minor change."

¶ 42    The court also found that communication and compromise continued to be an issue for the parties. Noting that counseling had improved communication of the parties previously, the court found that continued counseling was in the best interests of the family. To that end, the court ordered the minors to continue to attend counseling with Denhof, Jeffrey and Emily to continue family therapy with Dr. Chilamkurti, and both parents to undergo individual counseling. Additionally, the court provided each parent with three days each year for "special occasions," required the use of a parent coordinator to help resolve parenting issues, and designated OFW as the parents' primary method of communication.

¶ 43    Finally, the court addressed Emily's contempt petition, concluding that Jeffrey "violated the clear language" of the custody judgment relating to President's Day in 2018 and Easter in 2018. As a "purge" for his indirect civil contempt, the court held that "Emily is entitled to receive three overnights from Jeff's parenting time" to be used in 2020 and not on Jeffrey's holiday or vacation time. The court denied Emily's request for fees. This appeal by Jeffrey followed.

¶ 44                                    II. ANALYSIS

¶ 45    On appeal, Jeffrey challenges the trial court's rulings with respect to his modification petition on two principal grounds. First, he argues that the trial court erred by not finding a substantial change in circumstances had occurred since the entry of the June 2016 agreed order. Second, he argues that the trial court erred by ordering numerous "minor" changes to the parties' custody judgment. Jeffrey also challenges the trial court's ruling with respect to Emily's contempt petition, asserting that the trial court erred by finding him in indirect civil contempt. We address Jeffrey's argument with respect to each petition separately.

¶ 46                              A. Jeffrey's Petition to Modify

¶ 47    Jeffrey initially challenges various aspects of the trial court's resolution of his modification petition. Jeffrey contends that the trial court erred by finding that he failed to meet his burden of proof to show a substantial change in circumstances since the entry of the parties' June 7, 2016, agreed order modifying the custody judgment. Jeffrey also disputes the trial court's decision to order numerous modifications to the parties' custody judgment pursuant to section 610.5(e) of the Act and require the parties to attend individual counseling.

¶ 48                          1. Substantial Change in Circumstances

¶ 49    In count III of his Petition to Modify, Jeffrey sought an increase in his parenting time from the June 2016 agreed order, which granted him overnight parenting time with the minors 4 nights in a 14-day period. The trial court, after weighing the testimony and evidence, denied the request, concluding that Jeffrey failed to prove by a preponderance of the evidence that there had been a substantial change in circumstances. Jeffrey argues that the trial court's ruling was erroneous as the evidence adduced at trial overwhelmingly established a substantial change in circumstances occurred since the entry of the parties' June 7, 2016, agreed order modifying the custody judgment. In support of his position, Jeffrey cites the minors' expanded family, Emily's negative influence

on the minors' perception of him, the repeated DCFS investigations against him, the improvement in his relationship with the minors, improvements in the minors' social and academic lives, the minors' involvement in travel soccer and the elimination of Jeffrey's ability to coach them, the level of acrimony between him and Emily, and his increased flexibility with respect to work-related travel.

¶ 50    Section 610.5 of the Act authorizes the filing of motions to modify a plan or judgment allocating parental decision-making responsibilities and parenting time. 750 ILCS 5/610.5 (West 2018). Relevant here, section 610.5(c) of the Act provides:

> "Except in a case concerning the modification of any restriction of parental responsibilities under Section 603.10, the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5(c) (West 2018).

Thus, resolution of a custody-modification motion involves a two-step process. The court must first determine whether the movant has established, by a preponderance of the evidence, a substantial change in circumstances based on facts that have arisen since the entry of the existing parenting plan or allocation judgment or facts that were not anticipated when the existing parenting or allocation judgment was entered. 750 ILCS 5/610.5(c) (West 2018); *In re Marriage of Burns*, 2019 IL App (2d) 180715, ¶ 26. If the movant has not met his or her burden of showing a substantial change in circumstances, then the court must deny the modification petition.

Conversely, if the movant meets his or her burden of showing a substantial change in circumstances, the court addresses whether modification is necessary to serve the child's best interests. 750 ILCS 5/610.5(c) (West 2018); *Burns*, 2019 IL App (2d) 180715, ¶ 26.

¶ 51    Whether a substantial change in circumstances has occurred that would warrant a modification of parental decision-making responsibilities and parenting time is a factual inquiry. As such, we review a trial court's finding as to whether there was a substantial change of circumstances warranting a modification of custody under the manifest-weight-of-the-evidence standard. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004); *In re Marriage of Adams*, 2017 IL App (3d) 170472, ¶ 19; see also *In re In re Marriage of Wengielnik*, 2020 IL App (3d) 180533, ¶ 12 (noting, in the context of a petition to modify child support, when the trial court finds that no substantial change in circumstances has occurred, the reviewing court considers "whether the manifest weight of the evidence supports the finding"). Under the manifest-weight-of-the-evidence standard, we give deference to the trial court as the finder of fact because it is in a superior position to observe the demeanor of the witnesses, determine and weigh their credibility, and resolve any conflicts in the evidence. *Bates*, 212 Ill. 2d at 515-16; *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 95. Therefore, in determining whether the trial court's decision was against the manifest weight of the evidence, we view the evidence in the light most favorable to the appellee and, when faced with multiple reasonable inferences, will accept those inferences that support the trial court's ruling. *Bates*, 212 Ill. 2d at 516. A finding is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence. *Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 52    In this case, after thoroughly reviewing the record, we conclude that the trial court's finding

that Jeffrey failed to meet his burden of showing by a preponderance of the evidence that a substantial change in circumstances had occurred since the entry of the June 7, 2016, order was well supported by the evidence. In his Petition to Modify, Jeffrey alleged several changes in circumstances, all of which the trial court considered in its written ruling. The court found many of the changes in circumstances cited by Jeffrey were not, in the context of this family, substantial changes. For instance, the court acknowledged that the parties' remarriage and the addition of step-siblings and one half-sibling constituted changes. The court also recognized that the minors have gotten older, they are involved in more activities, and they are doing better academically and socially. However, the court concluded that these changes were not substantial in that they reflected "the normal evolution of a family and the maturation of the children."

¶ 53     Jeffrey contests the trial court's rationale, arguing that nothing in the Act suggests that what constitutes a substantial change "is limited to those which fall outside the norm of post-divorce families." He then posits that while circumstances such as "remarriage, new families, changing needs as children age, [and] pregnancies *** can all be considered 'normal' life events, *** it would strain credulity to suggest that these cannot be substantial, as 'routine' as they may be." However, we read nothing in the trial court's ruling to suggest that the circumstances referenced by Jeffrey could never constitute a substantial change. Rather, the trial court stated that Jeffrey failed to prove that such circumstances, in the context of *this* family, constituted substantial changes. The record supports the trial court's finding. Significantly, other than the existence of the changes themselves, Jeffrey does not point to anything to explain how the changes to the family structure constituted a *substantial* change of circumstances.

¶ 54     In this regard, the record established that despite the changes, the minors are happy and well adjusted, and their lives remain relatively the same as they were in June 2016. The minors

have resided in the same house in Vernon Hills since 2013 and attended the same school since first grade (A.M.N.) and kindergarten (A.N.N.). By all accounts, the girls are doing well academically and socially. The minors are in therapy but have been since A.M.N. was five and A.N.N. was three. Although Jeffrey contended in his modification petition that Emily frequently travels to Ohio, Emily testified that she only went twice during the minors' last school year. The minors continue to participate in soccer despite Jeffrey's inability to coach them, and Jeffrey testified that "nothing major" has changed related to the minors' activities other than A.M.N. joining basketball and the minors no longer participating in dance. The minors are bonded to both parents, care greatly for them, and enjoy a happy and healthy relationship with them. They also care greatly for their extended family members. Jeffrey himself acknowledged that his relationship with the minors "has always been good" and "continues to get better." Given the foregoing, the trial court's finding that these changes reflected the normal evolution of the family and, therefore, were not substantial was a reasonable conclusion based on the evidence presented at trial and not against the manifest weight of the evidence.

¶ 55    Jeffrey also claims that several of these changes, while not substantial on their own, when considered in the aggregate, exceed the substantial threshold. Among the changes cited by Jeffrey are "the marked improvement" in his relationship with the minors, the minors' improvement socially and academically, the minors' involvement in travel soccer and the elimination of Jeffrey's ability to coach, and the "the substantial level of acrimony" between him and Emily. Again, however, other than the changes themselves, Jeffrey does not elaborate on how these changes, either individually or collectively, amounted to a substantial change pursuant to section 605.10(c) of the Act. Indeed, as noted above, while Jeffrey's relationship with the minors may have improved, he testified that he has always had a good relationship with the minors. The

evidence also establishes that the minors have seen recent improvements in their academic endeavors. And while the minors have improved socially in the past year and are doing, "very good," they always have been. The minors have always participated in extracurricular activities, and while Jeffrey is no longer eligible to coach soccer, he continues to attend the minors' games and practices. As for Jeffrey's claim of substantial acrimony between him and Emily, the record shows that the parties' relationship has improved since June 2016. In this regard, Fisher recounted that while the parties' relationship is "strained at times" and "somewhat difficult," their communication has improved as the case has progressed. Jeffrey acknowledged that his relationship with Emily has continued to "ebb[] and flow[]" and is "similar to past years." The trial court's finding that these facts did not establish a substantial change in circumstances was also a reasonable inference based on the evidence presented at trial and not against the manifest weight of the evidence.

¶ 56    Jeffrey also argues that Emily "seriously attempted to alienate the [minors] from [him]" as evidenced by the minors "repeated visits to their schools [*sic*] principal's office to inform on their father," "the repeated unfounded DCFS investigations launched against [him]," and "the unanimous conclusion of virtually all professionals involved that Emily was brainwashing the [minors] and negatively influencing their perceptions of [him]." However, the trial court addressed these facts and determined that Jeffrey had failed to show that any of these circumstances had a lasting adverse impact on the minors or his relationship with them. The court noted that the last complaint to DCFS was in June 2018. The court also noted that, through counseling, the minors were visiting Jeffrey without complaint and enjoying their time with him. As such, the court concluded that to the extent there was a negative influence, the problem had been resolved and the situation had returned to the *status quo* at the time of the parties' custody judgment. We defer to

the trial court's findings and conclude the trial court's determination that this fact did not constitute a substantial change in circumstances was not against the manifest weight of the evidence. See *In re Custody of Saloga*, 96 Ill. App. 3d 661, 664 (1981) (declining to consider mother's "interlude" out of state with children in relation to change in circumstances since mother moved back to Illinois and terminated relationship). Thus, we find no error here.

¶ 57    Jeffrey also insists that the trial court "simply ignored [his] unrebutted and unimpeached testimony regarding his increased flexibility when it came to travel" and "wr[ote] off his testimony as 'not credible' without offering any sound basis for that conclusion." We disagree. In denying Jeffrey's position, the trial court stated in its written ruling that "[t]he only evidence [Jeffrey] proffered was his self-serving testimony that he has a greater flexibility" and that Jeffrey "admitted that even with this alleged greater flexibility he still missed half of his Wednesday parenting time and he missed at least 3.3 floating overnights per year (10 nights over three years)." Additionally, the court noted that Jeffrey offered "no documentary evidence to support his claim that he has more flexibility in his work schedule" and offered "no testimony as to what hours [he] works and whether the hours he puts in on a day to day basis has [*sic*] changed." The court further noted that Emily testified that Jeffrey "misses 10 floating overnights per year" and Fisher "expressed doubt whether [Jeffrey's] flexibility was as great as [Jeffrey] would believe." Insofar as the evidence presented at trial established that Jeffrey missed between 27 and 42 Wednesday dinners between June 2016 and the date of the trial, the trial court's finding that Jeffrey missed half of his Wednesday dinners was incorrect. Nevertheless, the principal basis for the trial court rejecting Jeffrey's testimony on this point was its finding that he lacked credibility and failed to proffer documentary evidence in support of his claim of greater flexibility in his work schedule. Having heard the testimony and evidence, including that of Fisher, Jeffrey, and Emily, the trial court was

in the best position to determine the witnesses' credibility. See *Bates*, 212 Ill. 2d at 515-16. The trial court's finding that Jeffrey's testimony regarding the flexibility of his work schedule was not credible—and therefore whether any alleged change in his work schedule constituted a substantial change in circumstances—was not against the manifest weight of the evidence.

¶ 58    Jeffrey also argues that the trial court's decision to analyze each of his proffered changes individually, rather than collectively, "missed the mark." According to Jeffrey, even assuming that no one change, standing alone, was substantial, the changes, taken together, were substantial. In support of this "wholistic approach," Jeffrey directs us to *In re Marriage of Valter*, 191 Ill. App. 3d 584 (1989).  However, *Valter* does not compel reversal of the trial court's finding that he failed to prove a substantial change in circumstances. Custody cases are *sui generis*. See *In re Parentage of Scarlett Z.-D.*, 2014 IL App (2d) 120266-B, ¶ 65. Moreover, the *Valter* court affirmed a finding of a substantial change in circumstances whereas Jeffrey requests us to reverse the trial court's finding that he failed to meet his burden of proving a substantial change in circumstances. In any event, *Valter* did not involve a situation comparable to the one presented here.

¶ 59    In *Valter*, custody of the minor was awarded to the mother upon dissolution of the parties' marriage in 1979. The parties later agreed to transfer custody of the minor to the father and to provide the mother summer visitation rights. The father, who was a member of the United States Air Force, was stationed in Crete. After he returned to the United States, he lived in Colorado with his third wife, their two children, and the minor. In the summer of 1988, when the minor was 12 years old, he went to visit the mother per the custody agreement. During the minor's visit, the father met a woman who would eventually become his fourth wife. Ten days after the couple met, the father asked the woman and her four children to move into his home. The minor learned about the change when he telephoned the father's home and a strange person answered. The mother then

filed a petition requesting custody of the minor. Following a hearing, the trial court found a substantial change in circumstances warranting a change in the minor's custody to the mother. In particular, the trial court cited: (1) the move from Crete to the United States; (2) the father's acknowledgment of an alcohol dependency that either arose subsequent to the custody transfer or was hidden from the court; (3) additional work and increased demands on the father's time which did not leave him "much time for his family or sleep"; and (4) the father's divorce and remarriage which "introduced a new stepmother and four additional children into [the minor's] household." *Valter*, 191 Ill. App. 3d at 588-90. The reviewing court affirmed. *Valter*, 191 Ill. App. 3d at 588-591.

¶ 60    Jeffrey observes that the appellate court agreed with the trial court that this last change—the introduction of a new step-mother and step-siblings—constituted "the most significant change of all." See *Valter*, 191 Ill. App. 3d at 590. Jeffrey argues that if the introduction of a new step-parent and new step-siblings was deemed more significant than an international move and a parent's battle with alcoholism in *Valter*, "the trial court's characterization *** as insignificant" in this case of the introduction of a new step-mother, new step-siblings, and a half-sibling in the lives of the minors "defies logic as well as caselaw." Contrary to Jeffrey's argument, however, it was not simply the existence of a new stepmother and new stepsiblings that the trial court relied on in finding of a substantial change in circumstances in *Valter*. Rather, it was the circumstances that resulted from those changes. For instance, the father's marriage to his fourth wife resulted in a total of seven children living in the household (the minor, the father's two children from his third marriage, and the stepmother's four children). The additional family members placed substantial social, financial, and temporal demands on the father. *Valter*, 191 Ill. App. 3d at 588-89. There was also evidence that "less than a familial relationship exist[ed] between [the minor] and his new

stepmother and step-sisters" and that the new stepmother made disparaging remarks to the minor about his mother. *Valter*, 191 Ill. App. 3d at 590-91. In addition, the evidence reflects that during the minor's summer visits with the mother, he was "quite happy, but as the end of summer approached, the minor would become "physically ill, refuse to eat, and at one point, suggested that he may run away." *Valter*, 191 Ill. App. 3d at 587. Further, while living with the father, the minor also experienced an "academic slide" that was attributed to "parental feuding." *Valter*, 191 Ill. App. 3d at 587. In addition, the minor had grown fearful of his father and had expressed a desire to live with his mother. *Valter*, 191 Ill. App. 3d at 591.

¶ 61 Nothing in this case rises to the same level of substantiality as *Valter*. To the contrary, the evidence in this case established that the minors are, and always have been, doing well in both their familial and academic lives. They care greatly about both parents and their extended families, enjoy their stepsiblings on both sides, and do not have anything "significantly negative" to say about their stepmother. Indeed, the only similarity between the minors in this case and the one in *Valter* is that the minors in this case have also expressed their wishes as to their schedule. In particular, the minors here told Fisher that "they were open to small changes, but they did not want any significant changes" and that they do not want to see their mother less. For these reasons, Jeffrey's reliance on *Valter* for reversal is not well taken.

¶ 62 In short, whether the factors cited by Jeffrey are considered individually or collectively, we conclude that the trial court's finding that Jeffrey failed to meet his burden of proving a substantial change of circumstances was not against the manifest weight of the evidence.

¶ 63                                    2. Modifications

¶ 64 Next, Jeffrey argues that the trial court erred by ordering numerous "minor" modifications to the parties' custody judgment pursuant to section 605.10(e) of the Act (750 ILCS 5/605.10(e)

(West 2018)). Jeffrey's argument in this regard is threefold. First, he asserts that the trial court's imposition of various "minor" modifications cannot be reconciled with its ruling regarding non-minor modifications. Second, Jeffrey asserts that the trial court erred, as a matter of law, by relying upon the child support statute when "eliminating" one of his weekly Wednesday dinners and replacing it with one additional overnight per month. Third, Jeffrey contends that the trial court erred in ordering the parties to attend individual counseling and by delegating its judicial authority to the parties' counselors. We address each contention in turn.

¶ 65                              a.  Modifications Pursuant to Section 610.5(e)

¶ 66     Although Jeffrey requested some of the modifications implemented by the trial court, he argues that the "myriad" of "minor" modifications the trial court made to the parties' parenting schedule were "anything but minor" and cannot be reconciled with the court's decision to classify his request for additional parenting time as "major" and therefore subject to the higher standard of section 610.5(c). Emily responds that the trial court acted within its discretion and pursuant to section 605.10(e) in ordering the changes. Emily points out that many of the modifications made by the trial court reflected the parties' course of conduct, while others merely clarified or rearranged the parties' parenting time so as to avoid misunderstandings or conflicts between the parties.

¶ 67     Section 610.5(e) of the Act (750 ILCS 5/610.5(e) (West 2018)) permits a trial court to modify a parenting plan or allocation judgment absent a showing of changed circumstances in limited situations. *In re Marriage of O'Hare*, 2017 IL App (4th) 170091, ¶ 17. Section 610.5(e) provides as follows:

> "(e) The court may modify a parenting plan or allocation judgment without a
>
> showing of changed circumstances if (i) the modification is in the child's best interests;

and (ii) any one of the following are proven as to the modification:

(1) the modification reflects the actual arrangement under which the child has been receiving care, without parental objection, for the 6 months preceding the filing of the petition for modification, provided that the arrangement is not the result of a parent's acquiescence resulting from circumstances that negated the parent's ability to give meaningful consent;

(2) the modification constitutes a minor modification in the parenting plan or allocation judgment;

(3) the modification is necessary to modify an agreed parenting plan or allocation judgment that the court would not have ordered or approved under Section 602.5 or 602.7 had the court been aware of the circumstances at the time of the order or approval; or

(4) the parties agree to the modification." 750 ILCS 5/610.5(e) (West 2018).

For purposes of section 610.5(e)(2), a "minor" modification is "small" or "inconsequential." *Burns*, 2019 IL App (2d) 180715, ¶ 29; *O'Hare*, 2017 IL App (4th) 170091, ¶ 27. Whether a modification is "minor" or otherwise fits within the parameters of section 610.5(e) is a factual inquiry. We will not reverse a trial court's factual findings unless they are against the manifest weight of the evidence. *In re Marriage of Wolff*, 355 Ill. App. 3d 403, 413 (2005); see also *Bates*, 212 Ill. 2d 489, 515 (2004) (instructing that standard of review of custody modification judgments is the manifest weight of the evidence). A decision is against the manifest weight of the evidence only where an opposite conclusion is clearly apparent. *Romano*, 2012 IL App (2d) 091339, ¶ 44. A trial court's ultimate decision to modify a custody judgment is reviewed for an abuse of discretion. *In re Marriage of Debra N.*, 2013 IL App (1st) 122145, ¶ 45. An abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no

reasonable person would take the view adopted by the court. *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 93.

¶ 68 Based on our review of the record, we cannot conclude that the trial court's decision to implement certain modifications pursuant to section 610.5(e) of the Act was against the manifest weight of the evidence or constituted an abuse of discretion. Relying on section 610.5(e)(1), the trial court (1) converted Jeffrey's "floating" bi-weekly overnight to a fixed bi-weekly overnight on Thursday and (2) eliminated both parties' right to exercise "four uninterrupted weekends a year." The court found that the former modification was warranted because it reflected the "course of conduct of the parties" and that the latter modification was warranted because it reflected "the custom and practice of the parties." The evidence of record supports these findings. In particular, the evidence showed that Jeffrey typically exercised his floating bi-weekly overnight on a Thursday. Similarly, the evidence at trial established that since the inception of the parties' custody judgment in October 2013, neither party exercised his or her right to the provision which provides each party the right to four uninterrupted weekends each year. In other words, these two modifications "reflect[] the actual arrangement under which the [minors have] been receiving care, without parental objection, for the 6 months preceding the filing of the petition for modification." 750 ILCS 5/610.5(e)(1) (West 2018). As such, the trial court's factual findings are not against the manifest weight of the evidence and its modifications in this regard did not constitute an abuse of discretion.

¶ 69 The trial court also modified the holiday schedule by (1) increasing by two hours each parties' parenting time on certain holidays (from 8 a.m. through 6 p.m. to 8 a.m. through 8 p.m.) and (2) expanding Jeffrey's parenting time on the President's Day holiday from one day to an entire weekend. Although the trial court did not specify the basis for the former modification, we

conclude that increasing by two hours each parties' parenting time on certain holidays constituted a "small" or "inconsequential" change that could reasonably be classified as "minor" under section 610.5(e)(2) of the Act. The trial court expressly classified the expansion of Jeffrey's parenting time on President's Day as "minor," noting that it will provide Jeffrey with two additional overnights per year. The trial court's factual finding that this latter modification is a "minor" one is not against the manifest weight of the evidence, and its modifications to the holiday schedule did not constitute an abuse of discretion.

¶ 70      Relying on section 610.5(e)(2) of the Act, the trial court also modified the parenting-time schedule in regards to the parties' vacation time, spring break, and Thanksgiving. With respect to vacation time, the October 2013 custody judgment provided in relevant part that each party "shall have the minor children with him or her for up to two (2) weeks each year, which shall not be taken consecutively, unless mutually agreed to by the parties." The trial court modified this provision "to follow a traditional parenting plan which allows the parties two weeks of vacation time with the children, to be taken as two 7 day blocks or one 14 day block of vacation time during the summer break." The trial court explained that it made the change because the original schedule "require[d] the parties to cooperate and compromise, which historically, the parties have not been able to accomplish." The evidence of record supports the trial court's decision. Fisher testified that both parties alleged that the other violated the parenting time as it relates to vacation time. Moreover, both parties testified that there have been conflicts around the use of the vacation time. In addition, the evidence supports the trial court's finding that the modification it implemented was "minor." In this regard, the trial court merely limited the parties' use of the vacation time to summer and required them to take it in either 7- or 14-day blocks.  Given this record, we conclude that the trial court's factual findings that such changes were "minor" were not against the manifest

weight of the evidence and its decision to modify the parties' vacation time did not constitute an abuse of discretion.

¶ 71    With respect to spring break, the October 2013 custody judgment provided that "[t]he parties shall equally divide the children's Spring Break until [A.N.N.] is in first grade" after which "the parties shall alternate the children's Spring Break, with EMILY having the odd years and JEFFREY having the even years." Noting that the interpretation of the Easter holiday has "initiated litigation between the parties," the trial court "clarified" this provision so that spring break "is to be alternated annually and that the parties maintain their alternate weekend attached to Spring break." The court's order further provides that if "the parent who does not have Spring Break in a given year has Easter, and Easter falls on the weekend of the parent who has Spring Break, the parties shall switch weekends so that the parent having Spring Break shall have 7 overnights in a row." The evidence of record supports the trial court's decision. Emily's contempt petition alleged Jeffrey failed to timely return the minors to her on Easter weekend in 2018. Jeffrey admitted that he "took time away from Emily's Easter" in 2018. In addition, the evidence supports the trial court's finding that the modification it implemented was "minor." In this regard, the trial court merely clarified how the parties would take spring break and rearranged the spring break schedule to minimize conflict between the parties. Given this record, we conclude that the trial court's factual finding that such changes were "minor" was not against the manifest weight of the evidence and its decision to modify the parties' vacation schedule did not constitute an abuse of discretion.

¶ 72    With respect to Thanksgiving, the October 2013 custody judgment provided that Emily would have the Thanksgiving holiday (from Wednesday at 5 p.m. until Sunday at 8 p.m.) in odd years and Jeffrey would have the Thanksgiving holiday in even years. Citing the facts that Emily has family out of state and the parties have "litigated holiday time over this weekend," the trial

court modified the Thanksgiving schedule so that the holiday begins "after school on the last day of school before break through Sunday night at 8 p.m." The court further provided that in the event there is no school the week of Thanksgiving, "then Thanksgiving break shall begin Tuesday at 12:00 p.m. to allow the party with Thanksgiving to travel." Again, the evidence of record supports the trial court's decision. The record establishes that the parties have disputed the Thanksgiving schedule. In addition, the evidence supports the trial court's finding that the modification it implemented was "minor." In this regard, the trial court merely clarified how the parties would exercise parenting time on Thanksgiving to minimize conflicts between them. Given this record, we conclude that the trial court's factual findings that such changes were "minor" was not against the manifest weight of the evidence and its decision to modify the parties' vacation schedule did not constitute an abuse of discretion.

¶ 73    Finally, in his modification petition, Jeffrey requested elimination of his "floating overnight" and asked the court to grant him parenting time every Wednesday after school through drop off at school. The court acknowledged that Jeffrey's three-hour block of parenting time every Wednesday was "not working." Based on the October 2013 custody judgment and the June 2016 agreed order, the court calculated that Jeffrey has 131 overnights each year. The court noted that if it were to convert Jeffrey's weekly Wednesday dinner to a bi-weekly overnight, Jeffrey would receive 24 additional overnights, increasing Jeffrey's parenting time by 6.6%, to 155 overnights per year. The court found that such a modification "would have a major impact because [Jeffrey] would cross the 146-day threshold for child support." See 750 ILCS 5/505(a)(3.8) (West 2018) (altering calculation for child support "[i]f each parent exercises 146 or more overnights per year with the child"). The court stated that in order to modify child support, a substantial change is required. The court noted, however, that if it were to convert one Wednesday per month to an

overnight, "that act would increase [Jeffrey's] parenting time by 12 overnights per year, constituting a 3.3% increase and approximately 143 overnights per year." The court found that a 3.3% increase in Jeffrey's parenting time "is in the minors' best interest and *** constitutes a minor change." The evidence supports the trial court's findings. Notably, although the parties disagreed about the number of Wednesday dinners Jeffrey missed, it is undisputed that Jeffrey's work schedule caused him to regularly miss parenting time on Wednesday evenings. Based on this record, the trial court could reasonably conclude that the Wednesday schedule was not working and was in need of modification. Thus, the trial court converted one of Jeffrey's Wednesday dinners each month into an overnight. The trial court found that this change increased Jeffrey's parenting time each year by 12 overnights, constituting a 3.3% increase, thereby constituting a minor change. Jeffrey does not seriously dispute the trial court's finding that this is a "minor" modification. Indeed, he asserts that such a change would not result in an "increase in the number of yearly contacts" since he already is scheduled to see the minors on Wednesday. Thus, we find no error.

¶ 74                                  b. Child Support Statute

¶ 75    Jeffrey further asserts that even assuming that the trial court properly applied section 610.5(e) when making modifications to the parties' parenting schedule, the trial court erred in the manner in which it made those modifications. In particular, Jeffrey claims that the trial court "erred by linking—and limiting—the amount of [his] parenting time to child support." In addressing this claim, *O'Hare*, 2017 IL App (4th) 170091, is instructive.

¶ 76    In *O'Hare*, the judgment of dissolution granted the father parenting time with the parties' child on alternating weekends (from Friday afternoon through Monday morning), every other Tuesday evening through Wednesday morning, and every other Wednesday evening through

Friday morning. This arrangement allocated 56% of the parenting time to the mother and the remaining 44% of the parenting time to the father. Six years later, the father filed a motion to modify, seeking to forego his overnight parenting time on Tuesday evenings in exchange for parenting time every Wednesday evening through Friday morning. This would represent a 6% increase in the father's parenting time, thereby resulting in the parties sharing parenting time equally. The trial court granted the mother's motion to dismiss, finding that "an additional overnight every 14 days is not a minor modification as contemplated by 750 ILCS 5/610.5(e)." In affirming, the reviewing court concluded that the father's request, which would alter the parenting plan "from one parent serving as the primary custodial parent to both parents having equal parenting time," did not constitute a minor modification within the meaning of section 610.5(e) of the Act. *O'Hare*, 2017 IL App (4th) 170091, ¶ 27.

¶ 77   Contrary to Jeffrey's assertion, the trial court did not improperly "link" the amount of his parenting time to child support. Rather, like the court in *O'Hare*, the court simply recognized that granting the additional overnights requested by Jeffrey would impact other areas of the case significantly and therefore would not qualify as a minor parenting-time modification. However, the court found that granting Jeffrey one additional Wednesday overnight per month would constitute a "3.3% increase," which would be "in the minor's best interest and *** a minor change."

¶ 78   Jeffrey asserts that a footnote in the trial court's ruling "dispels any doubts about the court's true purpose." In the footnote, the court stated that if its "calculation as to the number of [Jeffrey's] overnights is erroneous *** the Court shall reduce the additional Wednesday overnights from 12 per year to an amount that falls within 146 overnights per year." Again, we disagree. The court merely recognized that any change that would impact other areas of the case significantly would

remove the modification from the realm of "minor." Indeed, the trial court increased Jeffrey's parenting time to the extent it could without crossing the substantial change threshold. Thus, we find no error in this regard.

¶ 79    Quoting *In re Marriage of Popa*, 2013 IL App (1st) 130818, Jeffrey insists that " 'Illinois law is clear that support payments cannot be linked to visitation rights.' " Jeffrey takes this quote out of context. The *Popa* court actually stated "Illinois law is clear that support payments cannot be linked to visitation and that it is improper to deprive the children of support because of the supposed misconduct of the custodial parent." *In re Marriage of Popa*, 2013 IL App (1st) 130818, ¶ 25. This statement is consistent with section 509 of the Act, which provides that "[i]f a party fails to comply with a provision of a judgment, order or injunction, the obligation of the other party to make payments for support or maintenance or to permit visitation or parenting time is not suspended; but he may move the court to grant an appropriate order." 750 ILCS 5/509 (West 2018). In any event, Jeffrey's reliance on such authority is inapposite as we find no evidence that the trial court's decision was motivated by any misconduct on Jeffrey's part.

¶ 80                                c. Counseling

¶ 81    As noted earlier, in its December 9, 2019, order, the trial court found that communication and compromise continued to be an issue for the parties. Noting that counseling had previously improved communication of the parties, the court found that continued counseling was in the best interests of the family. To that end, the court ordered the minors to continue to attend counseling with Denhof and Jeffrey and Emily to continue to attend family counseling with Dr. Chilamkurti. The trial court also ordered Jeffrey and Emily to undergo individual counseling, stating, "Given the level of animosity and anger between the parties, the Court finds that it is in the best interest of the minor children to require both parents to undergo individual counseling with a counselor of

their [*sic*] choice at the frequency recommended by their [*sic*] counselor until further Order of the Court."

¶ 82    Jeffrey argues that the trial court erred in ordering the parties to attend individual counseling and by delegating its judicial authority to the parties' counselors. According to Jeffrey, nothing in the Act permits the court to compel individual counseling in the circumstances present here, much less to delegate its decision-making authority to the counselor. Therefore, while Jeffrey indicates that he "has every intention of continuing to attend individual counseling, he objects to doing so under pain of contempt" and requests reversal of the provision requiring the parties to undergo individual counseling. Citing various provisions of the Act, and noting that Jeffrey testified at trial that he supported individual counseling, Emily contends that the trial court was well within its authority to include a requirement that the parties attend individual counseling.

¶ 83    The trial court did not cite any statutory provision in support of that portion of its order requiring the parties to attend individual counseling. We note that section 607.6 of the Act (750 ILCS 5/607.6 (West 2018)), which both parties reference in their briefs, authorizes a court to order "individual counseling for the child, family counseling for one or more of the parties and the child, or parental education for one or more of the parties" if the court finds that "(1) both parents or all parties agree to the order; (2) the child's physical health is endangered or that the child's emotional development is impaired; (3) abuse of allocated parenting time under Section 607.5 has occurred; or (4) one or both of the parties have violated the allocation judgment with regard to conduct affecting or in the presence of the child." However, as noted above, the trial court did not cite to section 607.6 in its order, much less make any specific findings in accordance therewith in relation to the requirement that the parties attend individual counseling. Moreover, even if Jeffrey's testimony that he supported individual counseling is construed as an agreement to attend such

therapy, Emily did not believe she was in need of individual counseling and there is nothing in the plain language of section 607.6 that authorizes a court to order individual counseling for a parent. In addition, "individual counseling" cannot be considered synonymous with "parental education." See *In re Marriage of Paris*, 2020 IL App (1st) 181116, ¶ 38 (noting that "when the legislature uses certain words in one instance and different words in another, it intends a different meaning"). Had the legislature intended to authorize courts to order the parents to attend individual counseling in section 607.6, it could have easily done so. It did not, and we are without authority to read such a requirement into the statute. See *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 408 (2010) ("A court may not add provisions that are not found in a statute, nor may it depart from a statute's plain language by reading into the law exceptions, limitations, or conditions that the legislature did not express.").

¶ 84    Emily claims, however, that section 607.5(c)(3) of the Act (750 ILCS 5/607.5(c)(3) (West 2018)) permits the court to order individual counseling. Section 607.5 of the Act governs actions for the enforcement of allocated parenting time. 750 ILCS 5/607.5 (West 2018). The statute requires the trial court to "provide an expedited procedure for the enforcement of allocated parenting time" and sets forth the requirements for commencing an action for the same. 750 ILCS 5/607.5(a), (b) (West 2018). The statute further provides in pertinent part:

> "If the court finds by a preponderance of the evidence that a parent has not complied with allocated parenting time according to an approved parenting plan or a court order, the court, in the child's best interests, shall issue an order that may include one or more of the following:
>
> ***
>
> (3) upon consideration of all relevant factors, particularly a history or possibility of

domestic violence, a requirement that the parties participate in family or individual counseling." 750 ILCS 5/607.5(c) (West 2018).

The problem with Emily's position is that neither party sought relief under section 607.5(c)(3). See 750 ILCS 5/607.5(b) (West 2018) (setting forth requirements for commencing an action for the enforcement of allocated parenting time under the statute); see also *Suriano v. Lafeber*, 386 Ill. App. 3d 490, 492 (2008) ("A party cannot be granted relief in the absence of corresponding pleadings"). Moreover, although the trial court clearly found that Jeffrey had violated the parties' custody judgment, nothing in the trial court's order suggests that the mandate that both parties attend individual counseling was related to Jeffrey's violations of the custody judgment. Rather, as noted above, the trial court cited the "level of animosity and anger between the parties." Because the trial court ordered relief unauthorized by any authority of which we are aware, we reverse that portion of the order requiring the parties to undergo individual counseling. *Hatchett v. W2X, Inc.*, 2013 IL App (1st) 121758, ¶ 31 ("Proof without pleadings is as defective as pleadings without proof."). In light of our finding, we need not address Jeffrey's alternate claim that the requirement that the counseling continue until such time as the counselor determines it could end constituted an impermissible delegation of the trial court's judicial function.

¶ 85                          B. Emily's Contempt Petition

¶ 86    Jeffrey's final assignments of error relate to the trial court's ruling on Emily's contempt petition. As noted previously, on June 7, 2018, Emily filed a petition asking the trial court to hold Jeffrey in indirect civil contempt, alleging that he violated the parties' custody judgment by taking the minors Presidents' Day weekend in 2018 and keeping the minors longer than he was entitled to on Easter in 2018. In its December 9, 2019, judgment, the trial court held Jeffrey in contempt for his violations of the parties' custody judgment, revised the parenting-time schedule for the

President's Day and Easter holidays, and, as a purge, awarded Emily three overnights from Jeffrey's parenting time.

¶ 87    Jeffrey argues that the trial court erred in finding him in indirect civil contempt for two reasons. First, Jeffrey contends that the trial court improperly held him in indirect criminal, rather than civil, contempt without adequate due process. Second, Jeffrey argues that even if the trial court's contempt order was civil, rather than criminal in nature, reversal is still required because it was entered without the court first issuing a rule to show cause against him. We disagree with both propositions.

¶ 88    A contempt proceeding may be either direct or indirect, and either criminal or civil in nature. *Milton v. Therra*, 2018 IL App (1st) 171392, ¶ 34. Properly identifying the type of contempt is essential because the procedures that must be followed depend on the type of contempt involved. *Windy City Limousine Co. LLC v. Milazzo*, 2018 IL App (1st) 162827, ¶ 36. Whether contempt is direct or indirect turns on where the contemptuous conduct occurred. *In re Estate of Lee*, 2017 IL App (3d) 150651, ¶ 39. If the contemptuous conduct occurred in the presence of the court, the contempt is classified as direct contempt. *Lee*, 2017 IL App (3d) 150651, ¶ 39. If the contemptuous conduct occurred outside of the presence of the court, the contempt is classified as indirect contempt. *Lee*, 2017 IL App (3d) 150651, ¶ 39; see also *Pryweller v. Pryweller*, 218 Ill. App. 3d 619, 630 (1991) ("Where a parent is found in contempt for failure to turn a child over to the other parent for visitation or custody, the conduct occurs outside of the court's presence and must be construed as *indirect* contempt.") (Emphasis in original.). Here, Jeffrey was clearly subject to an indirect contempt finding because his violations of the custody judgment occurred outside the presence of the trial court. The issue before us is whether the indirect civil contempt finding should have been categorized as indirect *criminal* contempt.

¶ 89    Whether contempt is civil or criminal turns on the purpose of the contempt charge. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43 (1990). The distinction between civil and criminal contempt was succinctly explained in *In re Marriage of DePew*, 246 Ill. App. 3d 960, 966-967 (1993):

> "Civil contempt is coercive in nature rather than punitive; the finding of civil contempt results from failure to do something which the court has ordered for the benefit or advantage of another party to the proceeding, and the court acts to compel the contemnor to obey the order for the benefit of that other party. [Citation.] In civil contempt proceedings the contemnor must have the opportunity to purge the contempt, *i.e.*, be provided with the 'keys to his cell' even after he has been imprisoned, and must also have the power to comply with the order. [Citation.] In contrast, criminal contempt is an act committed against the majesty of the law in disrespect of the court or its process, and the court acts to preserve its dignity by punishing the wrongdoer. [Citation.] Criminal contempt sanctions are imposed for the purpose of punishing past misconduct. [Citation.] The test for determining whether contempt proceedings are criminal or civil in nature is the dominant purpose for which sanctions are imposed, and any incidental results or benefits of imposing the sanctions are of no consequence in making this determination."

¶ 90    As this court has recently recognized, while the test for distinguishing between civil and criminal contempt "might seem relatively straightforward, an analysis of the facts of any given case involving civil or criminal is crucial" because the two kinds of contempt often share the same characteristics. *In re Estate of Baldassarre*, 2018 IL App (2d) 170996, ¶ 28. "Criminal contempt sanctions may to some extent benefit parties to litigation, and civil contempt sanctions may vindicate judicial authority." *Betts*, 200 Ill. App. 3d at 46. As the *Betts* court illustrated:

"[C]ivil contempt sanctions sometimes consist of a fine for each day a violation of a court order continues. [Citations.] In such cases, the fines, once accrued, are a punishment for past misconduct. However, the test for determining whether contempt proceedings are criminal or civil in nature is the dominant purpose for which sanctions are imposed. Any incidental results or benefits of imposing the sanctions are of no consequence in making this determination. [Citation.] Thus, the fact that accrued daily fines for civil contempt are a punishment for past misconduct does not alter the fundamentally coercive nature of a sanction consisting of the daily accumulation of additional fines." *Betts*, 200 Ill. App. 3d at 46-47.

¶ 91    In this case, the dominant purpose for the trial court's sanctions was to secure Jeffrey's compliance with the underlying court order, *i.e.*, the parties' custody agreement. As noted, Emily filed a petition requesting a finding of indirect civil contempt. In its December 9, 2019, order, the trial court found Jeffrey in contempt. Specifically, the court concluded that Jeffrey failed to comply with the parties' custody judgment by taking the minors on the weekend preceding President's Day in 2018 (which was Emily's weekend) and by keeping the minors longer than he was entitled to during Easter break in 2018. As a purge, the court awarded Emily three overnights from Jeffrey's parenting time to be used in 2020 and not on Jeffrey's holiday or vacation time. The purge of three overnights represented the overnights Emily missed as a result of Jeffrey's violation of the custody agreement. See *In re Marriage of Knolls*, 2016 IL App (1st) 152494, ¶ 58 (suggesting that make-up parenting time, when it does not require action by a third party to be effective, may be a valid purge for violations related to parenting time). In this regard, the trial court's action was not a punitive effort to vindicate the authority of the court, but was remedial and for Emily's benefit. See *Baldassarre*, 2018 IL App (2d) 170996, ¶ 30 (1990). Moreover, to comply with the purge

provision, Jeffrey has to allow the make-up parenting time, putting the proverbial "keys to his cell" in his own hands. See *Knolls*, 2016 IL App (1st) 152494, ¶ 58. Thus, the trial court's actions clearly exhibited a dominant purpose to secure Jeffrey's compliance with the parties' custody judgment not to punish him for his prior conduct. We therefore conclude that the trial court properly held Jeffrey in indirect civil contempt.

¶ 92    Jeffrey claims that the trial court's purge cannot bring him into compliance with the custody judgment because his alleged violations of occurred in 2018. We disagree. As noted above, the purge of three overnights represented the overnights Emily missed as a result of Jeffrey's violation of the custody agreement in 2018. Thus, the purge makes Emily whole by providing her with the three overnights she missed in 2018 because of Jeffrey's violation of the custody judgment. Jeffrey also directs us to *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, in support of his position. We find Jeffrey's reliance on *Pavlovich* misplaced. First, contempt proceedings are *sui generis*. *Betts*, 200 Ill. App. 3d at 48 (1990). Second, *Pavlovich* involved the violation of a court order prohibiting the wife from leasing a condominium until she had obtained refinancing. It did not involve a violation of the visitation provisions of a custody judgment.

¶ 93    Jeffrey also argues that even if the trial court's contempt order was civil, rather than criminal in nature, its reversal is still required because it was entered without first issuing a rule to show cause against him.  We disagree.

¶ 94    Alleged contemnors are guaranteed certain due process protections in proceedings for indirect contempt. *People ex rel. Williams v. Williams*, 156 Ill. App. 3d 438, 442 (1987). With regards to indirect civil contempt, the alleged contemnor is entitled to minimal due process. *Betts*, 200 Ill. App. 3d at 52-53. The alleged contemnor must be informed of the charges against him or her " 'by information, notice, citation, or rule to show cause,' " given an opportunity to file an

answer, and accorded a fair hearing. *Williams*, 156 Ill. App. 3d at 442 (quoting *People v. Javaras*, 51 Ill. 2d 296, 300 (1972)); see also *Betts*, 200 Ill. App. 3d at 52-53 (noting that in civil contempt, the contemnor is entitled to minimal due process, consisting of notice and an opportunity to be heard). In this case, Emily filed her contempt petition on June 7, 2018, over a year before the commencement of the trial. Jeffrey filed a detailed response to the contempt petition on July 18, 2018. Over the course of the year between the filing of the contempt petition and the trial on all pending matters, the trial court entered various orders notifying Jeffrey of pre-trial and hearing dates on the parties' pending petitions. Further, on the first day of trial, Emily's attorney informed the trial court that the parties were there for a hearing on Jeffrey's modification petition "and also Emily's Petition for Rule to Show Cause filed *** June 7th of 2018." Jeffrey was represented by counsel at the trial and testified regarding the allegations in the contempt petition. Based on this evidence, Jeffrey cannot legitimately maintain that he was not given notice regarding his alleged contempt or that he was deprived of an opportunity to be heard regarding the same. Jeffrey was provided all the due process to which he was entitled with respect to Emily's Contempt Petition.

¶ 95    Jeffrey cites to *Milton*, 2018 IL App (1st) 171392, in support of his argument that where a rule to show cause does not issue against an alleged contemnor, a finding of civil contempt cannot stand. However, that case is inapposite. In *Milton*, the trial court failed to provide the alleged contemnor with an evidentiary hearing or adequate notice of the time and place of such hearing. *Milton*, 2018 IL App (1st) 171392, ¶ 38. The *Milton* court held that the alleged contemnor was "not informed of the charges against her by 'information, notice or rule to show cause' before the court granted relief." *Milton*, 2018 IL App (1st) 171392, ¶ 41. Unlike the alleged contemnor in *Milton*, Jeffrey was given more than sufficient notice that the hearing that commenced on October 7, 2019, would concern whether he should be found in contempt.

¶ 96    In short, Jeffrey has failed to demonstrate any error by the trial court with respect to its finding of indirect civil contempt.

¶ 97                              III. CONCLUSION

¶ 98    For the reasons set forth above, we reverse that portion of the trial court's judgment requiring the parties to attend individual counseling. The trial court's judgment is affirmed in all other respects.

¶ 99    Affirmed in part and reversed in part.