# Illinois Official Reports

## Appellate Court

---

### *In re Estate of Baldassarre*, 2018 IL App (2d) 170996

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF MARY BALDASSARRE, an Alleged Disabled Person (Thomas Baldassarre and Denise Bosh-Williams, Petitioners and Counterrespondents-Appellees, v. Arthur Erhardt, Respondent and Counterpetitioner-Appellant). |
| District & No. | Second District<br>Docket No. 2-17-0996 |
| Filed | October 25, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 16-P-1076; the Hon. Robert G. Gibson, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part.<br>Cause remanded with directions. |
| Counsel on Appeal | Schmidt & Barbrow, P.C., of Wheaton (Janella L. Barbrow and Mark T. Schmidt, of counsel), for appellant.<br><br>Terra Costa Howard, of Glen Ellyn, and Banahan & Haas, of Geneva (Brian J. Banahan and David A. Martin, of counsel), for appellees.<br><br>Bruce Garner, of Schirott, Luetkehans & Garner LLC, of Itasca, guardian *ad litem*. |

JUSTICE BURKE delivered the judgment of the court, with opinion. Presiding Justice Hudson and Justice Hutchinson concurred in the judgment and opinion.


## OPINION

¶ 1     This appeal arises from a petition for the appointment of a guardian for Mary Baldassarre, an alleged disabled person, filed by her children, petitioners Thomas Baldassarre and Denise Bosh-Williams, after Mary was diagnosed with an inoperable brain tumor. Respondent, Arthur Erhardt, had been Mary's domestic partner for over 32 years. During the guardianship proceedings, the trial court found Arthur to be in indirect civil contempt of court and ordered him to be incarcerated for 30 days. Arthur appeals from the contempt finding and order of incarceration. We affirm in part, vacate in part, and remand the cause for further proceedings.

¶ 2                                I. BACKGROUND

¶ 3     Arthur and Mary met after Mary's husband passed away. Mary's deceased husband was the father of their children, Denise and Thomas.

¶ 4     In May 2003, Arthur and Mary jointly purchased a home at 171 Franklin Street, Bloomingdale, Illinois (Franklin residence). The couple lived together until September 2016, when Mary was diagnosed with an inoperable brain tumor. After Mary was hospitalized and had biopsy surgery, she began living with Denise.

¶ 5     Conflicts arose between Arthur and Denise and Thomas shortly after Mary's diagnosis. On November 15, 2016, Thomas and Denise filed a joint petition for guardianship over Mary. Arthur filed a counterpetition seeking guardianship of the estate and Mary. The trial court appointed a guardian *ad litem* (GAL) on December 20, 2016, set dates and times for Arthur to visit with Mary, and affirmed Denise's health care power of attorney.

¶ 6     In early March 2017, Mary discovered that Arthur had been moving some of her money into accounts solely in Arthur's name since September, which Arthur admitted. Mary terminated her relationship with Arthur.

¶ 7     More bickering ensued over Mary's personal property located in the Franklin residence. On April 13, 2017, Mary filed an emergency motion for entry of the residence and return of the personal property, alleging that Arthur had repeatedly denied her access to her home and her belongings. On April 14, the court granted Mary's motion and ordered specific items returned to her, including her clothing, jewelry, baking items, and make-up. On the same date, Mary's children filed a citation to discover assets.

¶ 8     On April 20, 2017, the court suspended Arthur's power of attorney for property and froze all but one of Arthur's accounts, pending the turnover of financial documents. The citation to discover assets against Arthur was conducted in open court on April 27, 2017. During the citation hearing, Arthur admitted that he had Mary sign the title to her own vehicle and then he sold it for less than fair market value but never told Mary he sold it. He also admitted to changing the locks and alarm codes to the Franklin residence in the fall of 2016. Despite an earlier court order to turn over property, Arthur testified that he donated Mary's baking items without her knowledge. He also acknowledged that he had reviewed an April 5, 2017, letter

from Mary's counsel to his own counsel, requesting that specific items of Mary's personal property be returned. The court ordered all parties not to remove any personal property from the Franklin residence.

¶ 9     At a May 11, 2017, hearing, Arthur testified that he did not donate all of Mary's baking items as he previously testified and that he possessed Mary's items despite a prior court order to turn them over to her. The court ordered Arthur to provide the garage access code so that Mary could pick up some of her items that he had boxed up and arranged for pick-up.

¶ 10    On May 19, 2017, the parties entered into an agreed order settling some financial matters. The order also permitted Mary to remove a few items from the home such as make-up, high school yearbooks, purses, cookbooks, and cookie cutters.

¶ 11    On June 1, 2017, Mary and Arthur entered into an agreed order listing the Franklin residence for sale. The order specifically provided that "[a]ny property that Arthur Erhardt *** has removed from the home shall be returned within 24 hours." The order further declared that Arthur "shall provide the location and access where all personal property has been relocated from the house."

¶ 12    Mary subsequently learned that Arthur allegedly had cleaned out nearly all of the property in the Franklin residence without leave of court and without notice to her. This property included many of her belongings that had been ordered returned to her. On August 9, Mary filed a petition for a rule to show cause against Arthur, alleging that he was in indirect civil contempt for violating two court orders, entered April 27 (which had been filed by the clerk on May 1) and June 1, respectively, by removing all or substantially all of the personal property from the Franklin residence and then failing to return it. Thomas and Denise joined in Mary's petition for a rule to show cause.

¶ 13    On August 9, Arthur filed an emergency motion to continue the hearing on the previously issued citation to discover assets. Arthur alleged a potential fifth amendment issue because he was advised by counsel that Denise and Thomas had initiated a criminal complaint against him. There is no record of a criminal complaint being filed against Arthur. The court continued the citation hearing and ordered that no property was to be removed from the Franklin residence.

¶ 14    On August 11, Mary filed a citation to discover assets against Arthur. Mary alleged that Arthur had removed, destroyed, or converted all of her personal property, in violation of standing court orders. She alleged that Arthur previously had admitted under oath that he gave away some of her personal property and sold her car. The discovery citation included a list of personal property that, despite the court orders, had not been tendered to Mary.

¶ 15    The court issued a rule to show cause against Arthur on August 23, 2017, and set a hearing for September 20, 2017, regarding any personal property not returned to the Franklin residence. The court ordered Arthur to return the interior of the Franklin residence to a condition the same as or substantially similar to that shown in photographs for the MLS listing of the property. On September 13, 2017, Mary filed an inventory of personal property not returned to the Franklin residence as of September 11, 2017.

¶ 16    At the September 20, 2017, evidentiary hearing on Mary's petition for a rule to show cause against Arthur, the court heard testimony from the GAL and Denise as to which specific items of personal property had been inside the Franklin residence, which items remained missing, and who had access to the house and on what terms. Arthur was called to testify, but he asserted

his fifth amendment right against self-incrimination and rested his case without providing any evidence.

¶ 17    On September 22, 2017, the court entered an order finding Arthur to be in "deliberate and ongoing indirect civil contempt" of its orders dated April 27 and June 1, 2017, for removing and then failing to return numerous items of personal property to the Franklin residence. The court found that (1) a *prima facie* case for indirect civil contempt had been established during the proceedings held before it on August 23, 2017, which warranted the issuance of the rule to show cause against Arthur, (2) the evidence at the September 20, 2017, hearing "was insufficient" to overcome the *prima facie* case, and (3) Arthur provided no valid defense for his contempt. The court stated that Arthur could purge the contempt by returning "all missing items of personal property" by the next court date.

¶ 18    The court continued the matter to September 27, 2017, to determine whether Arthur had purged himself of the contempt or whether sanctions were necessary to coerce compliance with the court's orders. Arthur did not turn over the missing personal property as required by the court and, instead, returned a substantial amount of personal property to the Franklin residence. This necessitated an inventory of the contents, which was later filed on November 21, indicating which items remained missing.

¶ 19    On December 6, 2017, the court proceeded to a hearing to determine whether Arthur had purged himself of indirect civil contempt. At the hearing, the court again held Arthur to be in

> "deliberate and ongoing indirect civil contempt of its orders dated April 27, 2017, and June 1, 2017, for his removal of numerous items of personal property that were ordered not to be removed from the [Franklin residence], which were stated in the inventory filed on September 13, 2017, and for failing to return said personal property subsequent to its removal, as listed in the supplemental inventory filed on November 21, 2017, and as alleged in the petition for issuance of a rule to show cause against him."

On December 8, 2017, the court ordered Arthur to serve 30 days' incarceration but stayed enforcement until December 13, 2017, to allow Arthur to purge his contempt as per the terms of the September 22, 2017, order. The court also adjudicated Mary as a disabled person.

¶ 20    Following the court's ruling, Arthur moved to stay enforcement of the incarceration pending appeal. The court denied the motion. Arthur filed a notice of appeal and an emergency motion to stay the incarceration pending appeal. On January 2, 2018, we granted Arthur's emergency motion.[1]

¶ 21                                    II. ANALYSIS

¶ 22    Arthur appeals the trial court's contempt finding, arguing that it was actually criminal. When a contempt appeal is filed, the standard of review is abuse of discretion. *Illinois Emcasco Insurance Co. v. Nationwide Mutual Insurance Co.*, 393 Ill. App. 3d 782, 785 (2009). A trial court abuses its discretion only when " 'no reasonable person would take the view adopted by the trial court.' " (Internal quotation marks omitted.) *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 848 (2010) (quoting *Foley v. Fletcher*, 361 Ill. App. 3d 39, 46 (2005)). "Whether a contempt finding should be vacated is a question to be determined on the individual facts of

---

[1]Mary passed away after Arthur filed the present appeal.

the particular appeal." *Doe v. Township High School District 211*, 2015 IL App (1st) 140857, ¶ 121 (citing *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 122 (1982)).

¶ 23 The trial court provided the following basis for the indirect civil contempt finding:

"There's absolutely no reason that a person with terminal brain cancer shouldn't get her jewelry back, shouldn't get her cookbooks back, shouldn't get her purses back, shouldn't get a list—a list of items that, clearly don't belong to [Arthur] and that he refuses for whatever reason to return."

¶ 24 The court specifically requested that the attorneys take special care to draft a contempt order that complied with the court rules and common law for indirect civil contempt proceedings. The court particularly instructed Arthur that he could purge by simply "returning the belongings of Ms. Baldassarre to her prior to the next court date."

¶ 25 Arthur asserts that, by calling the criminal contempt proceedings civil, the trial court impermissibly shifted the burden of proof from the estate, Thomas, and Denise to him to prove that he was not in contempt. Arthur further maintains that he was denied his constitutional right against self-incrimination, compounding the prejudicial impact of shifting the burden of proof. Alternatively, he contends that the finding of civil contempt was an abuse of discretion because the order did not contain a valid purge provision or list the specific items that he must return.

¶ 26 By contrast, the estate, Thomas, and Denise contend that the trial court did not abuse its discretion in finding Arthur in indirect civil contempt, as Arthur was not punished by the court but was given the means by which to purge himself of the contempt by returning Mary's personal property. We do not believe we can fully address the parties' claims without first analyzing and distinguishing civil versus criminal contempt.

¶ 27 First, civil contempt proceedings have two fundamental attributes: (1) the contemnor must be capable of taking the action sought to be coerced and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 44 (1990) (citing *People ex rel. Melendez v. Melendez*, 47 Ill. 2d 383, 387 (1971)). *In re Marriage of Depew*, 246 Ill. App. 3d 960, 966-67 (1993), succinctly presents the law on this point:

"Civil contempt is coercive in nature rather than punitive; the finding of civil contempt results from failure to do something which the court has ordered for the benefit or advantage of another party to the proceeding, and the court acts to compel the contemnor to obey the order for the benefit of that other party. [Citation.] In civil contempt proceedings, the contemnor must have the opportunity to purge the contempt, *i.e.*, be provided with the 'keys to his cell' even after he has been imprisoned, and must also have the power to comply with the order. [Citation.] In contrast, criminal contempt is an act committed against the majesty of the law in disrespect of the court or its process, and the court acts to preserve its dignity by punishing the wrongdoer. [Citation.] Criminal contempt sanctions are imposed for the purpose of punishing past misconduct. [Citation.] The test for determining whether contempt proceedings are criminal or civil in nature is the dominant purpose for which sanctions are imposed, and any incidental results or benefits of imposing the sanctions are of no consequence in making this determination."

¶ 28 While this test might seem relatively straightforward, an analysis of the facts of any given case involving civil or criminal contempt is crucial, as the two often share the same

- 5 -

characteristics. "Criminal contempt sanctions may to some extent benefit parties to litigation, and civil contempt sanctions may vindicate judicial authority." *Betts*, 200 Ill. App. 3d at 46. "For instance, civil contempt sanctions sometimes consist of a fine for each day a violation of a court order continues." *Id.* at 46-47; see *Madden v. Grain Elevator, Flour & Feed Mill Workers, International Longshoreman Ass'n, Local 418*, 334 F.2d 1014, 1017, 1020 (7th Cir. 1964), *cert. denied*, 379 U.S. 967 (1965); see generally *Spallone v. United States*, 493 U.S. 265 (1990); *United States v. Barnett*, 330 F.2d 369 (5th Cir. 1963). In such cases, the fines, once accrued, are punishment for past misconduct. *Betts*, 200 Ill. App. 3d at 47. However, it is the sanctions' dominant purpose that determines whether the contempt is criminal or civil. *Id.* The *Betts* court explained that, while the accrued daily fines for civil contempt are a punishment for past misconduct, it does not alter the fundamentally coercive nature of sanctions consisting of the daily accumulation of fines. *Id.* Finally, a reviewing court will not be bound by the trial court's classification of the contempt but, rather, will examine the nature of the sanctions imposed. *SKS & Associates, Inc. v. Dart*, 2012 IL App (1st) 103504, ¶ 14.

¶ 29 Here, the dominant purpose for which the trial court imposed sanctions was to secure Arthur's compliance with the court's orders. On September 22, 2017, the court entered an order holding Arthur in indirect civil contempt and mentioned that he could purge the contempt by returning the property. The case was continued to September 27, 2017, and then to December 6, 2017, to determine whether Arthur had purged the contempt. On December 8, 2017, the court imposed the 30-day period of incarceration but stayed the sentence for five days to allow Arthur to purge the contempt.

¶ 30 The trial court's actions were remedial and for Mary's benefit. See *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 632 (1988). They were not a punitive effort to vindicate the authority of the court. See *Betts*, 200 Ill. App. 3d at 46. Mary filed a petition requesting a finding of indirect civil contempt, and the trial court's order held Arthur to be in indirect civil contempt. While a determinate sentence was ultimately imposed, Arthur was given several opportunities to purge the contempt. Had he done so, no sentence would have been served. The trial court's actions clearly exhibited a dominant purpose to secure Arthur's compliance.

¶ 31 Arthur relies on *In re Marriage of Morse*, 240 Ill. App. 3d 296 (1993). In *Morse*, the trial court found the husband in indirect civil contempt for (1) failing to authorize his attorney to turn over escrow funds, (2) failing to make mortgage payments, and (3) failing to pay child support and maintenance. *Id.* at 300. On the first finding of contempt, the court sentenced the husband to seven days in jail but gave him the opportunity to purge the contempt by signing any authorization needed to release the escrow funds by March 1, 1991. *Id.* As to the second finding, the court sentenced the husband to 30 days' incarceration but stated that he could purge the contempt by bringing all mortgage payments current by March 16, 1991. *Id.* On the third finding, the court sentenced the husband to seven days in jail but stated that he could purge the contempt by bringing the support and maintenance current by March 16, 1991. *Id.*

¶ 32 The husband filed a motion to reconsider the contempt findings, and the motion to reconsider was continued until trial. *Id.* at 300-01. Following the trial, the judgment confirmed the previous contempt findings and made an additional finding of contempt for the husband's failure to pay support and maintenance. *Id.* at 301. The additional finding sentenced the husband to 90 days' incarceration but stayed the mittimus to September 16, 1991. *Id.* The order further stated that he could purge the contempt by being current on all support and maintenance on September 16, 1991. *Id.*

¶ 33    The husband argued on appeal that the orders of contempt were not civil but were findings of indirect criminal contempt and that, since they were rendered in the absence of procedural safeguards afforded in criminal proceedings, they should be reversed. *Id.* at 302. We noted that the distinction between civil and criminal contempt depends on the nature of the sanctions imposed, rather than on the trial court's characterization, and cited numerous cases regarding the distinction, including *Betts*. *Id.* We stated that the trial court intended to enter civil contempt orders. *Id.* at 303.

¶ 34    Despite the trial court's intentions, however, we found that the sanctions were punitive because the purging provisions were limited. In making this finding, we relied on the characterization of criminal contempt set forth in *In re Marriage of Talmadge*, 179 Ill. App. 3d 806, 818 (1989). We stated that, "[i]f there is an inability, at any time, by the contemnor to be able to purge himself, then the type of contempt is criminal in nature." *Morse*, 240 Ill. App. 3d at 303 (citing *Talmadge*, 179 Ill. App. 3d at 818). We determined that there was an inability by the contemnor to purge himself because, for example, if the husband failed to do so by March 1, 1991, he would go to jail for seven days with no further opportunity to purge himself. *Id.* We concluded, therefore, that all the findings at issue were of indirect criminal contempt. *Id.*

¶ 35    In *Morse*, we acknowledged that "one may conclude that" the contempt findings "are examples of civil contempt" and "[i]ndeed, that is what the trial court intended in making these findings." *Id.* And even though we cited *Betts*, we never applied a dominant-purpose analysis to the facts as *Betts* directs. See *Betts*, 200 Ill. App. 3d at 47. Had we conducted a dominant-purpose analysis, we most likely would not have outright reversed the contempt orders, since we found that the trial court had intended civil contempt findings. In *Morse*, as here, the fixed terms of imprisonment would have been entirely eliminated if the husband had purged the contempt within the times provided. The dominant purpose was clearly remedial and not punitive. Accordingly, we decline to follow *Morse* here.

¶ 36    In a civil context, noncompliance with a court order is *prima facie* evidence of contempt. *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 829 (1994). When a party establishes a *prima facie* case of contempt, the burden shifts to the contemnor to show cause as to why he should not be held in contempt. *In re Marriage of Betts*, 155 Ill. App. 3d 85, 98 (1987). To meet this burden, the contemnor may present evidence that his noncompliance was not willful and contumacious and that he had a valid excuse. *Id.* Here, a *prima facie* case had been established against Arthur and, consequentially, the burden had shifted to him to show cause as to why he should not be held in contempt for his failure to comply with the prior court orders.

¶ 37    As to Arthur's contention regarding his constitutional right against self-incrimination, we observe that had this been an instance of criminal contempt, Arthur's assertions would be correct. He would enjoy the same protections as an actual criminal defendant, including the presumption of innocence, the privilege against self-incrimination, and the requirement that contempt would have to be proved beyond a reasonable doubt. It is well settled that "[i]ndirect criminal contempt proceedings must generally conform to the same constitutionally mandated procedural requirements as other criminal proceedings," and thus "[t]he privilege against self-incrimination" is applicable to a respondent in an indirect criminal contempt proceeding. *Betts*, 200 Ill. App. 3d at 58. However, as we determined, this was not a case of criminal contempt; thus, the higher standards of procedural due process afforded criminal defendants were

inapplicable here. Moreover, the fifth amendment privilege is not a substitute for evidence and may not be used to avoid meeting a burden of production. See *United States v. Rylander*, 460 U.S. 752, 758 (1983). The trial court did not hold Arthur in contempt for asserting his fifth amendment privilege. Instead, the trial court held Arthur in contempt because he failed to meet his burden of showing why he should not be held in contempt. See *In re Marriage of Ray*, 2014 IL App (4th) 130326, ¶ 22.

¶ 38    Nevertheless, we agree with Arthur that the determinate sentence imposed was improper and must be vacated. The December 8 order sentenced Arthur to serve 30 days in the Du Page County jail if he failed to purge, by December 13, his deliberate and ongoing indirect civil contempt, as set forth in the September 22 order. The September 22 order did not specify the items that must be returned. Longstanding precedent unequivocally states that sanctions levied for civil contempt must be coercive, continuing, open-ended, and subject to being purged:

> "Imprisonment imposed for a criminal contempt is purely punitive and must be for a definite term. [Citations.] But in cases of civil contempt, the sentence being imposed as a remedial or [coercive] measure, the appropriate punishment is to commit the contumacious party to imprisonment until he has complied with the mandate of the court, since a fine or imprisonment for a specified term might not secure obedience to the order." *People v. Redlich*, 402 Ill. 270, 277 (1949).

¶ 39    As in *Redlich*, the trial court's order here could allow Arthur to evade the coercive nature of the sanctions. If Arthur is willing to sit in jail for 30 days rather than turn over Mary's personal property to her estate, the coercive effect is lost. Thus, we affirm the finding of indirect civil contempt, but we vacate the sentence and remand the cause for the trial court to enter a continuing and indeterminate sentence. The order shall provide that Arthur may purge himself of the contempt either before or during his imprisonment and shall list which specific items must be returned.

¶ 40    Arthur last contends that the trial judge was personally biased against him and requests that on remand a different judge be assigned. Arthur lists a number of examples of what he believes represent the trial judge's personal bias against him.

¶ 41    Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) permits a reviewing court, in its discretion, to make any order or grant any relief that a particular case may require, including the reassignment of a new judge on remand. *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002). A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice. *Id.* at 280. The conclusion that a judge is not impartial is not lightly made. *Id.* The party making the charge of prejudice must present "evidence of prejudicial trial conduct and evidence of the judge's personal bias." *Id.* Upon our review, Arthur has failed to show that the trial judge displayed " 'such a high degree of favoritism or antagonism as to make fair judgment impossible.' " *Id.* at 281 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Arthur's request to have this case assigned to a different judge on remand is denied.

¶ 42                                        III. CONCLUSION

¶ 43    For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed in part and vacated in part, and the cause is remanded with directions.

¶ 44        Affirmed in part and vacated in part.

¶ 45        Cause remanded with directions.