2022 IL App (2d) 200556-U
Nos. 2-20-0556 & 2-21-0011 cons.
Order filed November 4, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| RENEE BEATON, | ) | of Kane County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 18-D-92 |
| | ) | |
| JAY BEATON, | ) | Honorable |
| | ) | William J. Parkhurst |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Brennan and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in finding respondent in indirect civil contempt for willfully failing to make maintenance and child support payments, and we are without jurisdiction to review the trial court's judgment of dissolution.

¶ 2    Respondent, Jay Beaton, appeals the judgment of the circuit court of Kane County dissolving his marriage with petitioner, Renee Beaton. Specifically, respondent appeals the circuit court of Kane County's classification of certain monetary gifts as income for purposes of calculating maintenance and child support. Additionally, respondent appeals the trial court's order finding that he was in indirect civil contempt for failure to make child support payments. We

dismiss the portions of the consolidated appeals dealing with the court's judgment of dissolution and affirm the trial court's finding of contempt.

¶ 3                                    I. BACKGROUND

¶ 4      On January 23, 2018, petitioner filed her petition for dissolution of marriage. According to the petition, the parties were married on October 6, 2001, in Du Page County. The parties produced three children during their marriage: (1) S.B., who was born in September 2002; (2) N.B., who was born in May 2004; and (3) J.B., who was born in February 2008. During their marriage, the parties lived in a large home in Wayne, where their children all had their own rooms in addition to five bathrooms, a master suite, and a spare office. On November 27, 2018, the trial court entered its allocation judgment, specifying, among other things, that petitioner "shall *** be designated as the parent with the majority of parenting time" and "shall also be designated as having legal custody of the minor children."

¶ 5      On January 22, 2020, the case progressed to trial for what seems to be a determination of maintenance and child support. Evidence adduced at trial established that, until 2007, respondent earned approximately $100,000 a year working for Canon. In 2008, respondent voluntarily left his position at Canon after a "management shakeup," because he wished to pursue "the opportunity to be a business owner." This venture proved fruitless, and, in 2016, respondent entered the mortgage business, becoming a loan officer. During most of the parties' marriage, petitioner worked as a freelance make-up artist, later completing training to apply permanent makeup to medical patients. Respondent reported that, in the four years prior to trial, he had never made over $40,000 a year from his professional salary, but the parties' 2016 joint tax return represented that the parties had earned $63,376 during that time, with petitioner generating only $4375 of the parties' joint income that year. Nonetheless, respondent testified that his income for 2017, 2018, and 2019 had

decreased. Petitioner's professional income was unsteady—the parties' tax returns indicated that she had earned $4375 in 2016, $21,657 in 2017, and approximately $4000 in 2018. According to petitioner's 2019 W-2 statement and other financial documents, she generated approximately $27,000 in revenue during 2019 from her makeup business.

¶ 6     J.B. was born shortly after respondent left Canon. Eight weeks later, J.B. was diagnosed with cancer. As a result of respondent's underemployment and J.B.'s "pretty steep" medical expenses, respondent began withdrawing funds from his 401(k) account—which contained $500,000—to keep the family afloat. In 2010, respondent also liquidated his children's education funds—which contained approximately $60,000—to help cover living expenses. Around this time, respondent also filed for bankruptcy, which resulted in a number of J.B.'s medical bills being discharged. In 2011,[1] respondent secured what he characterized as an $85,000 "loan" from his brother, which effectively kept the parties' home out of foreclosure. Respondent never repaid his brother, there was no promissory note evidencing the "loan," and respondent's brother did not charge him interest on the $85,000.

¶ 7     In March 2012, Respondent exhausted his 401(k) account. He faced a tax penalty for prematurely withdrawing the money from his 401(k) account, which totaled "around [$]16,000." The parties' tax refunds were withheld to be applied to the overdue balance.

¶ 8     After having depleted his 401(k) account, respondent's mother began wiring money to him, which helped keep the family afloat. The average amount of each transfer is ambiguous—some testimony suggested that the payments approximated $3000 to $3500, while petitioner argued at

---

[1]The timing of the $85,000 loan is vague. At some times, respondent testified that the "loan" was made in 2014. At other times, he suggests that it was made in 2011.

trial—without contest—that the wire transfers averaged $5000 per month. Petitioner was aware of the wire transfers, which were deposited into the parties' joint account. These transfers were both voluntary and made pursuant to respondent's requests. There was only one occasion on which respondent's mother did not immediately transfer a requested payment to respondent, due to a technical issue. Respondent had nonetheless received the wire transfer shortly thereafter.

¶ 9    In 2016, respondent completed a loan modification for the family's Wayne home. Following the loan modification, the home's remaining mortgage balance surpassed the value of the property, with each mortgage payment exceeding $2600 a month. Respondent's salary was insufficient to cover this amount. In June 2018, months after initiating the instant dissolution proceedings, petitioner moved out of the Wayne residence. Pursuant to a prenuptial agreement, the Wayne residence remained solely as respondent's property. While respondent consequently remained in the Wayne home, petitioner moved into a "two-bedroom, two-bathroom condo" in South Elgin with the parties' children.

¶ 10    A few months before petitioner moved out, in April or May 2018, respondent received $370,000 resulting from the sale of a family farm that was located in North Dakota. Respondent's late father and mother had each owned 50 percent of the North Dakota property prior to its sale, and, after respondent's father passed away and the farm was sold, his mother "inherited his 50 percent [of the sale proceeds], which went into a trust." From there, the money was distributed to other family members included in the trust, with respondent receiving $370,000 of the total sale proceeds. Respondent's mother's share of the proceeds totaled more than $1 million dollars. Respondent opened a private Chase account under his own name and immediately deposited his sale proceeds therein. Petitioner was initially unaware that respondent opened the private account. Respondent would transfer money from his private account to the parties' joint account for the

household "as needed." These transfers "would show up on [the parties' joint] Chase account as transfers from savings." Respondent testified that, on average, he would deposit "[t]hree to four thousand per transfer," and he would typically make one or two such transfers each month. However, based on a "gentleman's agreement" between the parties, petitioner did not access the parties' joint account after these deposits were made, although respondent did not necessarily prohibit her from doing so.

¶ 11    Respondent's bank statements spanning from April 20, 2018, to October 31, 2018, showed that he spent roughly $140,000 in the six months following his receipt of the $370,000 check. Instead of satisfying any of his outstanding debts with the farm proceeds, respondent testified that, in the fall preceding trial, he used over $50,000 of the $370,000 to build "a new patio with fire pits" and a built-in TV for the Wayne house, as its preexisting patio "was in disrepair." Respondent also used portions of the $370,000 to put a $10,000 down payment on a BMW automobile, because his prior car "needed $3800 worth of front[-]end repair." Additionally, he used the farm proceeds to pay for "three cataract surgeries" totaling approximately $24,000, dental work totaling approximately $20,000, mortgage payments for the nonmarital residence, further renovations in the nonmarital residence, and the parties' attorneys' fees. Based on all these costs, petitioner surmised that roughly $193,000 should have remained from the $370,000 in farm proceeds. Respondent could not account for this missing money. At the time of trial, respondent reportedly only had $3500 of proceeds remaining from the farm proceeds. Petitioner, who had since become aware of the $370,000 payment, was surprised that respondent did not use any of the farm proceeds to fund their children's educations. Respondent had recently told his mother that he had depleted the $370,000.

¶ 12    Around the same time respondent received the farm proceeds, his mother stopped sending her monthly wire transfers; respondent explained that she instead had to pay "$11,800 a month to live in a nursing home along with [his] handicapped sister." While respondent had initially testified that his mother's payments had ended a year and a half after he had depleted his 401(k) account, he eventually agreed that "the last wire transfer from [his] *** mom's account" took place on April 9, 2018.

¶ 13    At the time of trial, petitioner was not receiving "any child support or maintenance" from respondent. Instead, since moving out of the nonmarital residence, she had received "three different lump sum payments" from respondent totaling $42,000. She used portions of this money for attorneys' fees and to sustain herself and the children. She and the children "live[d] very frugally" and also obtained some "support from Link for food."

¶ 14    On April 3, 2020, the trial court issued its letter opinion, awarding petitioner maintenance and child support in the amounts of $1244 a month and $1270 a month, respectively.  In reaching these amounts, the court considered the applicable statutory guidelines in calculating support and described the "convincing and largely uncontested evidence" of the "significant financial assistance" that respondent received from his family. The court discussed the wire transfers respondent had been receiving from his mother, which it found were made with "specificity and regularity" before respondent received the $370,000 in farm proceeds. The court also characterized the $85,000 that respondent had received from his brother as a "gift," as respondent's brother had never attempted to collect payment on the $85,000. Regarding respondent's farm proceeds, the court further noted that "[t]he disappearance of the $370,000 occurred over a time span of approximately 20 months from May 2018 to the time of trial on [January 22, 2020]," and "there [was] no accounting for the approximately $10,000 per month" defendant had spent during this

time. The court also described the monthly wire transfers respondent had been receiving from his mother, concluding that they should be classified as income for purposes of determining maintenance and child support:

"The question in this case is not if consistent family gifts to [respondent] should be included in his income for purposes of support analysis[,] but rather how much should the court include given the April 2018 inheritance of $370,000[,] most of which has not been accounted for. One way to analysis [*sic*] this is to take the number of months from the inheritance to the date of trial (approximately 20 months) and use that number to divide the amount for which [respondent] has failed to account (approximately $200,000). Clearly, the income to [respondent] since the time of the inheritance has eclipsed the previous consistent gifts of $5,000 per month. Under these circumstances, the court finds that including gifts of $5,000 per month to [respondent's] income is a conservative amount."

While the court found it fair to include $5000 a month—representing the average monthly amount of the wire transfers—as income for purposes of determining respondent's support obligations, it only imputed an additional $3500 a month onto respondent's income.

¶ 15    On May 28, 2020, the trial court entered its judgment for dissolution of marriage, incorporating the holdings from its earlier, April 3, 2020, letter opinion therein. Additionally, the judgment specified that respondent was "solely responsible for paying the balance due to the [IRS]" that resulted from respondent's premature depletion of his 401(k) account.

¶ 16    On June 22, 2020, petitioner filed her first petition for rule to show cause, arguing that, since the court issued its judgment, respondent had not made any child support or maintenance payments. On June 29, 2020, respondent filed his motion to reconsider, arguing that the court erred

when it calculated his income to include his mother's prior financial gifts, which had purportedly ceased in May 2018.

¶ 17     On August 25, 2020, the trial court held its hearing on respondent's motion to reconsider. After hearing the parties' arguments, the court found that it "made the right decision" in calculating respondent's income.

¶ 18     The topic of the hearing then shifted to petitioner's motion for a rule to show cause. Respondent testified, admitting that, in "any month since the [c]ourt entered its judgment," he had not paid the ordered amounts of child support or maintenance to petitioner, despite being aware of his support and maintenance obligations under the court's May 28, 2020, order. He was unaware of the total amount he had paid to petitioner since January 2020 but testified that he had given her proceeds from every paycheck that he had been earning. Evidence adduced at the hearing—in the form of certain checks respondent had made out to petitioner—later established that he had only paid her $1500 over the course of the year in a series of cashier's checks.

¶ 19     Petitioner asked respondent whether he had paid $4500 for his son, N.B., to purchase a car. Respondent testified that, in October 2018, he had given the money directly to N.B. At this time, N.B. was only 15 years old. When asked where respondent had gotten the $4500 from, he responded, "From the inheritance," later clarifying that he had taken the money out of his bank account prior to trial. Petitioner then asked, "Well, why, when you were asked at trial to account for the $370,000, why didn't you disclose that you had given [N.B.] $4,500 in cash during the trial in January?" Respondent responded, "Because once I gave it to [N.B.], it was no longer my money."

¶ 20     Respondent further testified that his mortgage was "five months in deferment," that he was behind with his utility bills, and that he had earned approximately $13,444 year to date. Respondent

testified that, at the time of the hearing, he was unable to "make [his] monthly expenses." Respondent testified that he was still paying off his new vehicle as well. Respondent reported that he had no other current sources of income outside of his current employment. When asked whether he was "seeking any other source of income other than [his] current employer," respondent responded, "None." His debt to the IRS remained outstanding, and the IRS had applied petitioner's 2019 tax refund—which totaled $9621—to the debt. Respondent had not reimbursed petitioner for this amount, despite the trial court having previously ordered that he was solely responsible for the outstanding IRS debt. He testified that he had not been working many hours during the COVID-19 pandemic, but that he was now working "more like 60" hours a week. Respondent had not asked his mother for any money during the 2020 calendar year.

¶ 21    Petitioner testified next, confirming that respondent had only paid her a total of $1500 in support and maintenance thus far in the year and that the IRS had intercepted her $9621 tax refund—which she had anticipated using to take care of the children. Petitioner was asked whether N.B. ever informed her that, in the months before purchasing the automobile, respondent had given him $4500 to purchase a car. Petitioner denied as much. She further pointed out that, once N.B. had found a suitable car for $9000, she and respondent had agreed to each pay for half of it. Respondent introduced an electronic message between the parties into evidence, in which petitioner proposed to respondent that, if he would pay $5000 for N.B.'s car, petitioner would pay for the remaining balance. The message was dated June 10, 2020. Petitioner was unsure of how respondent would have previously known that N.B. would need $4500 before N.B. had even chosen an automobile to purchase.

¶ 22    Following petitioner's testimony, the parties presented arguments as to the motion for rule to show cause. Petitioner contended that the court should find respondent in contempt, noting that

respondent's testimony was incredible. Specifically, petitioner pointed out that, while respondent had essentially testified that he could not afford to comply with the court's order setting support, he clearly had cash on hand, as evidenced by the $4500 payment that he had made to N.B. in June 2020. To this point, petitioner disputed respondent's earlier testimony that the $4500 payment had been made years prior, as further evidenced by the June 10, 2020, message between the parties. Petitioner also contended that, by paying petitioner solely in cashier's checks, respondent was attempting to conceal the source of his payments, presumably to hide the fact that he indeed had unreported cash available.

¶ 23    In response, respondent again contended that he had given his son the money for the vehicle years prior, when he had made a similar gift to his older daughter. Respondent also reiterated that, since 2018, he had not received any additional funds from his mother, that he had no funds remaining from the farm proceeds, and that he was behind on all of his bills. Therefore, according to respondent, there was no basis to believe that he was concealing any income from petitioner, and, because he was unable to meet any of his expenses, any failure to comply with the court's judgment of dissolution was not willful.

¶ 24    In issuing its ruling, the court first expressed surprise that respondent had made a "choice" not to reach out to any family members for financial assistance, despite its earlier "finding that [respondent] was able to get money from his mother and that that should be included in his income." The court held respondent in indirect civil contempt of court "for his willful failure to pay court ordered child support and maintenance," and further ordered that he could purge his contempt finding by becoming current in the support payments. The matter was continued for "status on payment of [the] purge," as well as "[sanctions] for contempt if necessary."

¶ 25    On September 24, 2020, respondent filed his first notice of appeal (appeal No. 2-20-0556), in which he appealed the trial court's May 28, 2020, dissolution judgment and August 25, 2020, contempt finding.

¶ 26    On October 6, 2020, the court held a hearing for status on the payment of the purge. While respondent was testifying, he introduced the following documents into evidence: (1) an August 28, 2020, pay statement showing that, up until that date, respondent had earned approximately $15,088 from his job with CrossCountry Mortgage for 2020; (2) a September 4, 2020, cashier's check showing a payment to petitioner in the amount of $509; (3) a September 25, 2020 pay statement showing that, up until that date, respondent had earned approximately $17,727 from his job with CrossCountry Mortgage for 2020; and (4) an October 2, 2020, cashier's check showing a payment to petitioner in the amount of $509. Respondent also described a spreadsheet—which does not seem to have been entered into evidence—purportedly establishing that his $370,000 in farm proceeds were in fact depleted. Respondent testified that he lacked the "wherewithal" to satisfy the outstanding arrearage for child support, maintenance, and any attorneys fees resulting from the instant matter. He further testified that he had no other sources of income.

¶ 27    On cross-examination, respondent testified that he had reached out to his mother and brother for financial assistance, but his mother had "no money to give" him and his brother did not want to play a part in the court's "extorsion" [sic]. When asked whether his brother had characterized the court's order as "extorsion" [sic], respondent later clarified that those were his own words, not his brother's. He then explained that, like his mother, his brother lacked the means to financially assist him. Petitioner asked:

"Can you explain to the [c]ourt how you can be working as hard as possible to earn income to satisfy the obligations to your family in a business that you've been involved in

- 11 -

for years, in a business where you followed the same mentor from place to place and only make $1,100 a month? Can you explain that to the [c]ourt?" Respondent replied, stating that it had been "an odd year," although he recognized that "the real estate market has picked up." He further testified that he had been working over 40 hours a week, and that he had four loans that would close soon, netting respondent a total of $5,000. Respondent had not "looked into" claiming "early Social Security," and was unaware that such a path would lead to his children receiving "a combined benefit that would be half of [his] total benefit."

¶ 28    The court asked respondent whether he had considered branching out into other forms of employment or if he had since applied to other mortgage businesses or banks to earn more income. Respondent responded in the negative. The court found that respondent had not purged the contempt and again held the matter over for 30 days to determine sanctions, effectively giving respondent additional time to gather funds to avoid being placed into custody.

¶ 29    On December 15, 2020, the parties appeared for a determination of sanctions as to the earlier finding of contempt. In allocution, respondent informed the court that he had made progress in securing some funds for the children through early Social Security benefits. Respondent reiterated that there was no way he could afford to pay the amount of support specified by the court's judgment, though, maintaining that his mother could no longer afford to support him and that "there [was] no money in the bank." Nonetheless, the court noted that respondent had not "done everything that the court ha[d] asked [him] to do," such as "seek other employment." Recognizing that respondent's support obligations did not constitute his family's debts, the court also noted that respondent had refused to reach out to any family members concerning financial assistance, as he had done "during the many years that [respondent] was married to [petitioner]." Ultimately, the court ordered respondent to appear on December 23, 2020, for incarceration

"unless [he came] up with $7500" before that date in order to become current with his support obligations.

¶ 30    During the December 15, 2020, hearing, petitioner also mentioned that she had filed a "new petition for rule and a new rule that issued for the accruing arrearages since August 25th, but also for [the] $9521 IRS tax refund that was intercepted on [petitioner's] tax [refund]." This second petition for rule to show cause does not appear within the record.

¶ 31    On December 23, 2020, the trial court entered a mittimus order placing respondent into custody pursuant to its earlier contempt finding. On January 6, 2021, respondent filed his second notice of appeal (appeal No. 2-21-0011), appealing the trial court's: (1) May 28, 2020, dissolution judgment; (2) August 25, 2020, contempt finding; and (3) December 23, 2020, mittimus order. On January 19, 2021, the trial court entered an order releasing respondent from the custody of the Kane County sheriff *instanter* and requiring him to appear on January 26, 2021, for "further sentencing on contempt on the Rule issued on [August 25, 2020]," "further status on payments," and for hearing on petitioner's second motion for a rule to show cause. On January 26, 2021, the trial court prepared an order—which was filed on January 27, 2021—specifying that petitioner had elected only to proceed with the second motion for rule to show cause, of which respondent was found in indirect civil contempt of court. The matter was continued to April 13, 2021, for sanctions. The record does not contain any transcripts from January 26, 2021, or any records whatsoever from the April 13, 2021, date to establish whether respondent was indeed sanctioned for his second finding of contempt.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, respondent argues that: (1) the trial court abused its discretion when it considered his mother's prior gifts as income, and (2) the trial court's finding of contempt "was

against the manifest weight of the evidence and an abuse of discretion." Because we lack jurisdiction to consider this first issue, however, we only consider respondent's arguments concerning his first contempt finding.

¶ 34                                   A. Jurisdiction

¶ 35     While the parties have not addressed whether we have jurisdiction over this appeal, we have an independent obligation to consider our jurisdiction, and find that we must dismiss the portions of respondent's consolidated appeal dealing with the trial court's May 28, 2020, dissolution judgment.

¶ 36     According to Illinois Supreme Court Rule 304(a) (eff. March 8, 2016):

> "If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both. *** In the absence of such a finding, any judgment that adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before the entry of a judgment adjudicating all the claims, rights, and liabilities of all the parties."

"This rule [is] meant to 'discourage piecemeal appeals in the absence of a just reason and to remove the uncertainty which existed when a final judgment was entered on fewer than all of the matters in the controversy.' " *In re Marriage of Gutman*, 232 Ill. 2d 145, 151 (2008) (citing *Marsh v. Evangelical Covenant Church of Hinsdale*, 138 Ill. 2d 458, 464 (1990)). "An order is final and appealable if it terminates the litigation between the parties on the merits or disposes of the rights

of the parties, either on the entire controversy or a separate part thereof." *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 159 (1998).

¶ 37    An exception to this rule deals with appeals from "order[s] finding a person or entity in contempt of court which impose[ ]a monetary [fine] or other penalty." Ill. S. Ct. R. 304(b)(5) (eff. March 8, 2016). In order for such an order to be appealable, the trial court issuing the contempt order and resulting sanction does not need to make an express written finding that "there is no just reason for delaying either enforcement or appeal or both" under Rule 304(a). *Id.* However, "only a contempt *judgment that imposes a sanction* is a final, appealable order." *Gutman*, 232 Ill. 2d at 152 (emphasis in original); see *Valencia v. Valencia*, 71 Ill. 2d 220, 228 (1978) ("Generally, it is held that where no punishment has been imposed an order adjudicating one to be in contempt is not final and is not reviewable").

¶ 38    Here, respondent filed his first notice of appeal for appeal No. 2-20-0556 on September 24, 2020, appealing the trial court's May 28, 2020, dissolution judgment and August 25, 2020, finding of indirect civil contempt. However, at the time, respondent was not yet sanctioned for the August 25, 2020, finding of indirect civil contempt, meaning petitioner's first petition for rule to show cause remained pending. *Gutman*, 232 Ill. 2d at 152; *In re Marriage of Knoerr*, 377 Ill. App. 3d 1042, 1049 (2007). As a result, at the time respondent's first notice of appeal was filed, we lacked jurisdiction to consider the court's May 28, 2020, judgment or the August 25, 2020, contempt finding. *Id.* On December 23, 2020, however, the trial court entered its mittimus order placing respondent into custody, providing us with jurisdiction to consider respondent's contentions as to the August 25, 2020, contempt finding under Illinois Supreme Court Rule 303(a)(2) (eff. July 1, 2017) ("When a timely postjudgment motion has been filed by any party, whether in a jury case or a nonjury case, a notice of appeal filed before the entry of the order disposing of the last pending

postjudgment motion, or before the final disposition of any separate claim, becomes effective when the order disposing of said motion or claim is entered").

¶ 39    On January 6, 2021, when respondent filed his second notice of appeal, the mittimus order had already been entered, meaning that we had jurisdiction to consider the trial court's August 25, 2020, finding of contempt in both appeals. However, petitioner's *second* petition for rule to show cause—as mentioned by the court in its December 15, 2020, order—remained pending at the time respondent filed his second notice of appeal. Because the record contains no indication that this second petition for rule to show cause had been finalized through the imposition of a corresponding sanction, we lack jurisdiction to address respondent's contentions as to the trial court's May 28, 2020, dissolution judgment, which did not include any requisite 304(a) findings. *Knoerr*, 377 Ill. App. 3d at 1049. For this reason, we dismiss the portions of appeals Nos. 2-20-0566 and 2-21-0011 dealing with the trial court's May 28, 2020, dissolution judgment.[2]

---

[2]Respondent may reinstate the dismissed portions of his appeal by refiling a notice of appeal within 30 days of (1) the entry by the trial court of a Rule 304(a) finding, or (2) the final judgment on petitioner's second petition for rule to show cause. *Knoerr*, 377 Ill. App. 3d at 1050. If the trial court's jurisdiction has lapsed, respondent may invoke the saving provisions of Illinois Supreme Court Rule 303(a)(2) (eff. July 1, 2017). *Id.* This rule allows us to give effect to a premature notice of appeal upon the resolution of the last pending post judgment motion. *Id.* If, upon receipt of this order, respondent is unable to timely file a notice of appeal, he may move within 21 days to establish our jurisdiction and supplement the record to show the resolution of the pending matters. If the motion is well-founded, we will grant it, vacate the aforementioned dismissals, and the parties may proceed with the appeal. See *Id.*

¶ 40                    B. August 25, 2020, Contempt Finding and Sanction

¶ 41    Having jurisdiction under Rules 304(b)(5) and 303(a)(2) to consider the portions of respondent's appeals dealing with the trial court's August 25, 2020, finding of contempt,[3] we find that the trial court did not abuse its discretion when making its first finding that respondent was in indirect civil contempt. Provisions in a judgment of dissolution concerning maintenance and child support may be enforced through contempt proceedings. 750 ILCS 5/502(e) (West 2020). In this context, a contempt petition is known as a " 'petition for rule to show cause.' " *In re Marriage of Berto*, 344 Ill. App. 3d 705, 711 (2003). "A rule to show cause is one means by which to bring an alleged contemnor before the trial court when the failure to comply with a court order is the alleged contemptuous behavior." *Id.*

¶ 42    " 'The power to enforce an order to pay money through contempt is limited to cases of willful [and contumacious] refusal to obey the court's order.' " *In re Marriage of Steinberg*, 302 Ill. App. 3d 845, 853 (1998) (citing *In re Marriage of Logston*, 103 Ill.2d 266, 285 (1984)). "The failure to make support payments as ordered is *prima facie* evidence of contempt." *In re Marriage of Barile*, 385 Ill. App. 3d 752, 758 (2008). After the party moving for a finding of contempt

---

[3]While it may be argued that the appeal as to the contempt proceeding became moot when respondent had been released from custody, we are unable to definitely establish as much, as it is unclear from the record whether respondent may face further sanctions as a result of the August 25, 2020, finding of indirect civil contempt, especially given the language in the January 19, 2021, which suggests that respondent never complied with the trial court's judgment of dissolution or otherwise purged his contempt. *In re Marriage of Betts*, 155 Ill. App. 3d 85, 104 (payment of a purge renders appeal as to a finding of contempt moot).

establishes a *prima facie* case of contempt, the burden shifts to the alleged contemnor to show that the failure to make the requisite support payments "was not willful or contumacious and that there exists a valid excuse for his failure to pay." *Id.* "To prove this defense, [one] must show that he neither has money now with which he can pay nor has he disposed wrongfully of money or assets with which he might have paid." *In re Marriage of Dall*, 212 Ill. App. 3d 85, 97 (1991). The defense of poverty or misfortune resulting in an ability to make court ordered payments "has been found applicable only in the most extreme cases, notably where a defendant had no money and no way of getting money to meet his support obligations." *Id.*; *In re Marriage of Betts*, 155 Ill. App. 3d 85, 100 (1987). "Whether noncompliance is [willful] or with a valid excuse is a question of fact for the trial court." *In re Marriage of Harvey*, 136 Ill. App. 3d 116, 118. An alleged contemnor cannot rely on the defense of poverty where the record shows that he or she unilaterally terminated his or her income or did not use available funds to pay court-ordered support. *Dall*, 212 Ill. App. 3d at 96-98. "When a contempt appeal is filed, the standard of review is abuse of discretion." *In re Estate of Baldassarre*, 2018 IL App (2d) 170996, ¶ 22; *In re Marriage of O'Malley ex rel. Godfrey*, 201216 IL App (1st) 151118, ¶ 25.[4]

¶ 43    In *Dall*, the respondent argued that the trial court abused its discretion in determining that the respondent was guilty of contempt for failure to pay child support. 212 Ill. App. 3d at 89. There,

---

[4]We recognize that some authority confusingly provides two standards of review for contempt appeals, providing that we will not disturb a trial court's findings unless they "are against the manifest weight of the evidence or the record reflects an abuse of discretion." *Barile*, 385 Ill. App. 3d at 759 (citing *Logston*, 103 Ill.2d at 286-87). However, our conclusions here remain the same under either the manifest-weight standard or the abuse-of-discretion standard.

at the time the court made its order setting the respondent's support obligations, the respondent voluntarily resigned from his employment as sheriff. *Id.* at 93-94. Consequently, the respondent stated that he was "unemployed, without income, ineligible to receive unemployment compensation, and unable to make the child support payments as ordered by the trial court." *Id.* at 94. The respondent did not seek alternate employment following his resignation and did not apply $7500 that he had since received in loans and other means towards his support obligations. *Id.* at 96. Nonetheless, the respondent argued that the trial court erred in finding him in contempt, as "his acknowledged failure to pay child support 'was not done in contempt, but rather for other reasons, namely, lack of income.' " *Id.* The appellate court found that, based on these facts, the respondent had not shown his "financial inability to comply with the order by the requisite definite and explicit evidence," meaning he failed to meet his burden of proof in showing his failure to meet his support obligations was not willful. *Id.* at 97.

¶ 44    Here, respondent seems to reason that the trial court's finding of indirect civil contempt was improper because it was based on "an erroneous imputation of financial gifts no longer available from [respondent's] 96-year-old mother," and because respondent "lacked the income to meet the court ordered obligations." For both of these reasons, respondent suggests that his failure to pay was not willful. We disagree.

¶ 45    Concerning respondent's first argument, that the trial court's wrongful inclusion of his mother's gifts as income provided him with a "valid excuse for failure to pay as ordered," we again note that we do not have jurisdiction to review the propriety of the May 28, 2020, dissolution judgment that defined respondent's income. *Knoerr*, 377 Ill. App. 3d at 1049. Accordingly, because we have no jurisdiction over that judgment, we will not consider whether the trial court's inclusion of the financial gifts of income—as set forth in the judgment—was proper.

¶ 46    Regardless, we note that, in determining whether respondent's failure to pay was willful, we are not concerned with whether respondent made a good faith attempt to pay what he considered to be appropriate support. Instead, the issue is whether respondent complied with the court's dissolution judgment as written, no matter if respondent disagreed with the reasoning behind it. *Steinberg*, 302 Ill. App. 3d at 853 (the issue in an appeal from a finding of contempt was "not whether [the] respondent acted with good intentions in paying what he thought was appropriate support. The issue [was] whether he made a good-faith effort to comply with the formula set out in the dissolution agreement").

¶ 47    Second, while respondent argues that he simply lacked the income to comply with his support obligations, we nonetheless conclude that the trial court's finding of indirect civil contempt was not an abuse of discretion. Again, once a party seeking a contempt finding has made a *prima facie* case of contempt by showing the contemnor has failed to make court-ordered support payments, the burden shifts to the alleged contemnor to show that such a failure was not willful or contumacious. *Barile*, 385 Ill. App. 3d at 758. Here, during the August 25, 2020, hearing on petitioner's first petition for rule to show cause, petitioner showed—and indeed respondent admitted—that he had not made his court-ordered support payments despite having knowledge of his obligations to do so. Consequently, it became respondent's burden to show that his failure to make the payments was not willful. *Id.* Although respondent tried to do so by arguing he lacked the means to comply with the court's order, the record shows that respondent made no attempts to acquire the funds to pay the court-ordered support, suggesting that his failure to pay support was willful. *Dall,* 212 Ill. App. 3d at 97.

¶ 48    Specifically, despite the fact that respondent's mother had never refused his repeated, prior requests for money—leading to the trial court's inclusion of the financial gifts as income—

respondent testified at the August 25, 2020, contempt hearing that he had not even attempted to ask his mother for financial assistance since the court entered its May 28, 2020, dissolution judgment. It can be further inferred that respondent neglected to ask his brother for any financial assistance as well, as respondent testified at the contempt hearing that he had not sought out additional sources of income. Again, like respondent's mother, the record shows that respondent's brother had previously acquiesced to respondent's earlier requests for assistance, as he had given respondent $80,000 to help respondent avoid foreclosure without ever seeking repayment of that amount. By failing to even request assistance from his family members, respondent effectively foreclosed a prior stream of income which had previously been available to him, similar to the respondent in *Dall* unilaterally resigning from his position as sheriff. *Id.* at 96. Because an alleged contemnor cannot rely on the defense of poverty while unilaterally foreclosing himself of possible income, and because respondent had not shown that he had no other ways of acquiring more finances to meet his obligations, the trial court properly found that respondent willfully disobeyed its judgment of dissolution setting respondent's support obligations. *Id.* at 97; *Betts*, 155 Ill. App. 3d at 100.

¶ 49    We recognize that, at the October 6, 2020, hearing on the status of respondent's purge, respondent had testified that, since the August 25, 2020, hearing, he had asked his mother and brother for financial assistance but was told they did not have the means to support him. Regardless, at the time the trial court made its August 25, 2020, finding of contempt, respondent had not made such requests to his family, meaning this fact is irrelevant in determining whether the trial court's August 25, 2020, contempt findings were proper. Still, the trial court does not seem to have accepted respondent's testimony, and, again, the question of whether a contemnor's willingness in disobeying a court order is a question of fact to be decided by the trial court. *Harvey*,

136 Ill. App. 3d at 118. Additionally, at the October 6, 2020, hearing, respondent again acknowledged that he had not sought out additional means of acquiring income. As provided above, the defense of poverty is not applicable unless a defendant can show that he had no money *and no way of getting money* to meet his support obligations. *Betts*, 155 Ill. App. 3d at 100.

¶ 50     Alternatively, the record here also suggests that respondent *did* have available funds which he could have put towards his support obligations. Accordingly, the trial court had a second basis to find that respondent's failure to comply with its dissolution judgment was willful. *Barile*, 385 Ill. App. 3d at 759. At the August 25, 2020, contempt hearing, the parties argued as to the date in which respondent allegedly gave $4500 to N.B. for a new car. While respondent suggested that he had given N.B. $4500, taken from his $370,000 in farm proceeds, in 2018, his testimony contradicts several portions of the record. As petitioner pointed out at the August 25, 2020, hearing, during trial, respondent was thoroughly questioned as to his various expenditures of the farm proceeds. At that time, despite extensive questioning on the subject, he never mentioned giving N.B. any money for a vehicle. Furthermore, N.B. was only 15 years old in 2018, meaning that, according to respondent's proffered timeline, he had given N.B. money for a year before N.B. would be able to legally drive. To this point, N.B. never mentioned to petitioner that he had previously received any money from respondent in 2018.

¶ 51     On the other hand, evidence in the record *does* suggest that the $4500 payment was made in 2020, during the time respondent was required to make support payments. As petitioner pointed out, the $4500 that respondent had given to N.B. was exactly half of the value of the car that N.B. had chosen in 2020, years after respondent insists he gave N.B. the money. Most importantly, perhaps, the electronic message entered into evidence during the August 25, 2020, hearing shows that petitioner and respondent had only agreed to split the cost of N.B.'s vehicle in June 2020,

suggesting that respondent had given N.B. the $4500—which again, was half the total cost of the car—at that time.

¶ 52    With this in mind, respondent's July 24, 2020, pay statement, which was presented at the August 25, 2020, hearing, indicated that, as of July 17, 2020, respondent had earned less than $9000 during that year thus far. It seems incredulous that respondent would have spent over half of his yearly earnings for N.B.'s new car while simultaneously failing to remain current with his support obligations. Instead, the electronic message between the parties in conjunction with respondent's pay stub suggests that respondent had an alternate, unreported source of income that enabled him to pay for N.B.'s vehicle. This conclusion is further bolstered by the fact that respondent failed to bring any bank statements to the August 25, 2020, hearing to affirmatively verify his supposed lack of funds, and by the fact that respondent utilized cashier's checks to make partial support payments to petitioner in 2020, effectively concealing the source of those payments. Accordingly, because respondent had unilaterally acted to foreclose a possible source of income and failed to otherwise establish a lack of means to comply with the court's May 28, 2020, dissolution judgment, the trial court correctly found that respondent's noncompliance was willful, meaning the decision to find respondent in indirect civil contempt was not an abuse of discretion.

¶ 53                                   III. CONCLUSION

¶ 54    For the reasons stated, we dismiss the portions of respondent's consolidated appeal attacking the trial court's judgment of dissolution and affirm the trial court's finding of contempt.

¶ 55    Appeal dismissed in part; judgment affirmed in part.